Antonio LOMELI, Appellant,

v.

SOUTHWEST SHIPYARD,
L.P., Appellee.

No. 01–10–00352–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

July 21, 2011.

Cory Daniel Itkin, Arnold & Itkin LLP, Houston, TX, for Appellant.

Michael Scott Beckelman, Sean Higgins, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, Houston, TX, for Appellee.

Panel consists of Justices KEYES, HIGLEY, and YATES.*

## OPINION

EVELYN V. KEYES, Justice.

Appellant, Antonio Lomeli, sued Southwest Shipyard, L.P. ("Southwest") for negligence after he fell into an open barge hatch and seriously injured his left leg. Southwest moved for summary judgment, asserting the exclusive remedy provision of the federal Longshore and Harbor Workers' Compensation Act ("LHWCA") as an affirmative defense. The trial court rendered summary judgment in favor of Southwest. In one issue, Lomeli contends that the trial court erred in rendering summary judgment because (1) Southwest failed to produce its contract with Lomeli's original employer, which requires an assumption that the terms of the contract negated any intent for Lomeli to become Southwest's "borrowed employee," and (2) Lomeli presented evidence raising fact issues on multiple factors of the borrowed employee test.

We affirm.

## Background

Labor Ready Central, Inc. ("Labor Ready") provides employees to other companies on a temporary basis. Southwest, a company that cleans, refurbishes, and repairs barges, contacts Labor Ready when it needs additional employees to complete its work. In November 2007, Labor Ready hired Lomeli, a welder, to work at Southwest. Lomeli worked at Southwest for approximately one month without incident. On December 18, 2007, a Southwest employee asked Lomeli to assist in pulling a piece of a barge back to the dry dock. As Lomeli walked backwards on the deck of the barge, he fell into an open hatch and seriously injured his left leg. Lomeli received worker's compensation benefits from Labor Ready as a result of this incident.

Lomeli sued Southwest for negligence, alleging, among other things, that Southwest failed to maintain safe premises, failed to warn of hidden hazards, failed to cure hidden hazards, and failed "to intervene ... when it knew that others were acting improperly." Southwest answered and asserted that Lomeli's claim was barred under the exclusive remedy provision of the LHWCA because Lomeli was Southwest's "borrowed employee," and, thus, Lomeli could only recover worker's compensation benefits under the Act and could not bring a tort action against Southwest.

Southwest moved for traditional summary judgment on its exclusive remedy affirmative defense. Southwest contended that Lomeli was its borrowed employee under the nine-factor test used by the Fifth Circuit because Southwest employees controlled the means and ends of Lomeli's work while he was at Southwest,

---

* The Honorable Leslie Yates, retired Justice, Fourteenth Court of Appeals, sitting by as-

signment. *See* Tex. Gov't Code Ann. § 74.003(b) (Vernon 2005).

Lomeli was performing Southwest's work at the time of the accident, Southwest and Labor Ready agreed that Lomeli would be under Southwest's direction and control while working at Southwest's facility, Labor Ready had no control over Lomeli's work at Southwest, Southwest could terminate its work relationship with Lomeli, and Labor Ready paid Lomeli based on work tickets verified daily by Southwest.

As summary judgment evidence, Southwest attached the affidavit of Wayne Herman, Southwest's Vice–President of Administration, and the transcript of Lomeli's deposition. Herman averred that, based on its agreement with Southwest, Labor Ready provides workers' compensation coverage for all Labor Ready employees assigned to work at Southwest. A portion of the fees paid by Southwest to Labor Ready covers this expense. Herman stated that although Labor Ready workers receive their paychecks from Labor Ready, "that is the extent of Labor Ready's involvement with the workers while they are at Southwest's facility." These workers are paid from funds provided to Labor Ready by Southwest. Herman averred that Labor Ready workers are assigned to Southwest for an indefinite period, and Southwest has the right to terminate its relationship with the assigned workers. Herman additionally averred that:

> [Lomeli] reported to the [Southwest] facility for his day-to-day work activities and was supervised by [Southwest] personnel. While working at the [Southwest] facility, [Lomeli] was expected to follow and abide by all [Southwest] policies and procedures. During this course of his employment at [Southwest], [Lomeli] used [Southwest] equipment and materials to complete those tasks to which he was assigned by [Southwest] personnel. All work that [Lomeli] completed while at the Southwest facility was related to the repair of barges for

the benefit of Southwest Shipyard. [Lomeli] was expected to complete the tasks in the manner approved by [Southwest]. On a daily and ongoing basis, [Lomeli] received his daily work orders from and was under the control, supervision and direction of [Southwest] supervisory personnel.

Herman concluded that "[f]or all intents and purposes," Labor Ready workers assigned to Southwest were employees of Southwest.

In his deposition, Lomeli testified that he applied for work at Labor Ready specifically "to get the job at Southwest Shipyard." Lomeli started working at Southwest on November 13, 2007, and he initially arrived at Southwest for the afternoon shift at the direction of Labor Ready. Lomeli testified that Labor Ready employees told him to report to Southwest, but once he arrived at Southwest, no Labor Ready employees told him where to weld or what work to do at Southwest's facility. Lomeli stated that only Southwest employees supervised him and his work while he was at Southwest. He also stated that Labor Ready provided his safety glasses and hard hat, that he owned his own life vest and safety gloves, and that Southwest provided the welding machine, the "rods" necessary for welding, and "anything else [Lomeli] needed to use." According to Lomeli, a Southwest supervisor verified the number of hours that he worked and signed his work ticket at the end of every day. Lomeli then provided these tickets to Labor Ready for payment. He agreed that if a Southwest employee did not sign his work ticket, he would not get paid for the work that he had done that day. Lomeli stated that "[t]he job I was doing was for Labor Ready," but he also agreed that he worked at Southwest fixing barges and that that "was Southwest Shipyard's business." Lomeli agreed that he was "working on the 3:30 shift because Southwest

Shipyard wanted [him] to be there for a 3:30 shift." Lomeli further agreed that he understood that he would continue to work at Southwest until "somebody at Southwest Shipyard felt that they didn't need [him] anymore."

Lomeli also testified that Labor Ready was his employer and that he never felt as though he was working for Southwest. He stated that if a Labor Ready employee had visited Southwest and told him to do something, he would have followed the Labor Ready employee's instructions even if those instructions conflicted with instructions from a Southwest employee. Lomeli believed that only Labor Ready could fire him and that Labor Ready could, at any time, tell him to stop working at Southwest.

In response to Southwest's summary judgment motion, Lomeli argued that all nine borrowed employee factors either favored him or were neutral, and, thus, he raised a fact issue regarding whether he was Southwest's borrowed employee. As summary judgment evidence, Lomeli attached the transcript of his deposition, the deposition of Mark Aguilar, Southwest's Health and Safety Supervisor, the deposition of Maria Davila, Southwest's Human Resources Manager, and Southwest's discovery responses.

Lomeli contended that Labor Ready, and not Southwest, had control over him because Labor Ready told him when to arrive at Southwest, Labor Ready "[told] him what to do," and he would follow Labor Ready's instructions over Southwest's instructions if the two conflicted. Additionally, Davila testified that issues concerning Southwest employees' performance come to her attention in her capacity as Human Resources Manager, but she does not address issues concerning the performance of Labor Ready employees.

Lomeli also contended that he was not performing Southwest's work when he fell because Southwest did not own or operate barges. Instead, because Lomeli was working on a barge owned by Kirby Inland, Lomeli was performing Kirby's work at the time of the accident. Lomeli also argued that because Southwest had not produced its contract with Labor Ready during discovery, although Davila acknowledged that she had once seen a contract between Southwest and Labor Ready, the trial court should apply spoliation principles and presume that the contract provided that Labor Ready employees were not considered Southwest's borrowed employees.

Lomeli argued that there was no evidence that Southwest considered him to be its employee or that he agreed to be Southwest's employee, and he pointed to his testimony that he would follow Labor Ready's instructions over Southwest's instructions as support for this contention. He also contended that he and Labor Ready never terminated their employment relationship: Lomeli returned to work for Labor Ready after receiving treatment for his injuries, and Davila testified that Labor Ready employees remain Labor Ready employees while working at Southwest. Lomeli also relied on his testimony that Labor Ready furnished him with safety equipment before he began working at Southwest. Lomeli testified that, to his knowledge, only Labor Ready could terminate his employment. When asked whether she could terminate a Labor Ready employee based on performance issues, Davila testified that she is "not involved with Labor Ready people." [1] Further-

---

1. Davila later testified that if a Labor Ready employee performed poorly, this would not be brought to her attention as Human Resources Manager, but the Southwest supervisors had the right to tell a Labor Ready employee not to return to the shipyard if they were unsatisfied with the employee's performance.

more, both Lomeli and Davila testified that Lomeli was paid by Labor Ready. Lomeli concluded that "every factor in the borrowed servant analysis favors [him]," and, thus, summary judgment was improper.

The trial court rendered summary judgment in favor of Southwest and dismissed Lomeli's claims with prejudice. This appeal followed.

## Standard of Review

■ We review de novo the trial court's ruling on a summary judgment motion. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex.2009). To prevail on a traditional summary judgment motion, the movant must establish that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Little v. Tex. Dep't of Criminal Justice*, 148 S.W.3d 374, 381 (Tex.2004). A defendant may prevail on summary judgment if it conclusively proves an affirmative defense. *See Rhone–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex.1999). A movant seeking traditional summary judgment on an affirmative defense has the initial burden of demonstrating its entitlement to judgment as a matter of law by conclusively establishing each element of the affirmative defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex.2008) (per curiam); *see also* Tex.R. Civ. P. 166a(b)-(c). A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex.2005).

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995). Evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex.2007) (per curiam). To determine if the nonmovant has raised a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding*, 289 S.W.3d at 848 (citing *City of Keller*, 168 S.W.3d at 827). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *See Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002) (citing *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)).

## "Borrowed Employee" under the LHWCA

■ In his sole issue, Lomeli contends that the trial court erred in rendering summary judgment in favor of Southwest because he raised a fact issue regarding whether he was Southwest's "borrowed employee," and, thus, Southwest was not entitled to summary judgment based on the exclusive remedy provision of the LHWCA.

Under the LHWCA, an employer's liability is limited to workers' compensation benefits under the Act, and this remedy is "exclusive and in place of all other liability of such employer to the employee...." 33 U.S.C.S. § 905(a) (1994); *see White v. Bethlehem Steel Corp.*, 222 F.3d 146, 148 (4th Cir.2000) ("Covered employees cannot bring a personal injury action against their employer; their only remedy with regard to their employer is through the LHWCA."); *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1243 (5th Cir.1988) ("Worker's compensation under the LHWCA is the exclusive remedy for an

employee against his employer because the Act bars all common law tort actions against the employer...."); *Gaudet v. Exxon Corp.*, 562 F.2d 351, 356 (5th Cir. 1977) ("The LHWCA was designed to provide an injured employee with certain and absolute benefits in lieu of possible common law benefits obtainable only in tort actions against his employer.").

The definition of "employer" in section 905(a) "encompasses both general employers and employers who 'borrow' a servant from that general employer." *White*, 222 F.3d at 149; *see also Melancon*, 834 F.2d at 1243 ("If Mr. Melancon was found to be the 'borrowed employee' of Amoco, he was covered by the LHWCA, entitling him to workers' compensation under this Act."). "A person can be in the general employ of one company while at the same time being in the particular employ of another 'with all the legal consequences of the new relation.'" *White*, 222 F.3d at 149; *Hall v. Diamond M Co.*, 732 F.2d 1246, 1249 (5th Cir.1984) ("The borrowed servant doctrine is the functional rule that places the risk of a worker's injury on his actual rather than his nominal employer. It permits the injured worker to recover from the company that was actually directing his work.") (quoting *Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 178 (5th Cir.1981)).

To determine borrowed employee status under the LHWCA, the Fifth Circuit has established the following nine-factor test:

(1) Who had control over the employee and the work he was performing, beyond mere suggestion of details or cooperation?

(2) Whose work was being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

*Billizon v. Conoco, Inc.*, 993 F.2d 104, 105 (5th Cir.1993); *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 676 (5th Cir.1993) (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310 (5th Cir.1969)). Although the Fifth Circuit has repeatedly stated that "[n]o single factor, or combination of them, is determinative," the court has also repeatedly considered the first factor—control over the employee's work—to be the "central factor" in determining borrowed employee status. *Brown*, 984 F.2d at 676; *see also Melancon*, 834 F.2d at 1245; *Capps v. N.L. Baroid–NL Indus., Inc.*, 784 F.2d 615, 616–17 (5th Cir.1986); *Gaudet*, 562 F.2d at 356 ("[N]o one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship.") (quoting *Ruiz*, 413 F.2d at 312–13). The issue of borrowed employee status is generally a question of law for the trial court, but "some cases involve factual disputes" and these cases require findings by the factfinder. *Brown*, 984 F.2d at 677. If "sufficient basic factual ingredients are undisputed, the court may grant summary judgment." *Capps*, 784 F.2d at 617 (citing *Gaudet*, 562 F.2d at 359).

### 1. *Who had control over the employee and his work?*

The Fifth Circuit has often considered this factor to be the "most important" factor in the borrowed employee analysis. *See Brown*, 984 F.2d at 676 (stating, "[I]n many of our prior cases, [the Fifth Circuit]

has considered the first factor—control—to be the central factor."); *Capps*, 784 F.2d at 617 (calling control the "most important" of the nine factors); *see also Lockett v. HB Zachry Co.*, 285 S.W.3d 63, 75 (Tex. App.-Houston [1st Dist.] 2009, no pet.) (noting, in general Texas workers' compensation context, that "[b]orrowed employee status hinges on whether the other employer or its agents have the right to direct and control the employee with respect to the details of the particular work at issue") (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex.2003)).

In *Brown*, the Fifth Circuit determined that a fact issue existed regarding which entity controlled the details of Brown's work because Brown presented evidence that, at one point during his employment with Union Oil, he was supervised by and received instructions from an employee of Gulf Inland, his original employer, and Union Oil presented evidence that only its employees supervised Brown and gave him his work instructions. 984 F.2d at 677. The court also noted that Brown had presented evidence that he followed Union Oil's instructions "unless the instructions were contrary to Gulf Inland's policies or safety practices" and that he was supposed to call Gulf Inland if Union Oil told him to do something contrary to Gulf Inland's policies. *Id.*

In *Melancon*, however, the Fifth Circuit held that Amoco, the "borrowing" employer, "clearly had control over Melancon and his work" because Melancon "took orders only from Amoco personnel who told him what work to do, and when and where to do it." 834 F.2d at 1245. The court observed that Beraud, Melancon's original employer, "gave no instructions to Melancon except to go to the Amoco field and perform the work requested by Amoco personnel." *Id.; see also Capps*, 784 F.2d at 617 ("Baroid [borrowing employer] clearly had control over Capps and his work.... Capps also testified that Davis [original employer] gave him no instructions concerning the work he was to perform at Baroid.").

Lomeli contends that this factor weighs in his favor because Labor Ready told Lomeli what work to do and where to go to complete his work, provided the work tickets, trained Lomeli on his welding work, and required Lomeli to follow its instructions in the event of a conflict between it and Southwest. He further argues that he raised a fact issue because Southwest did not exercise "performance control" over Lomeli, it did not maintain a personnel file on Lomeli, it did not train Lomeli, and it did not provide a Southwest uniform to Lomeli.

Lomeli testified that Labor Ready told him when to be at Southwest on his first day of working there, but, after this point, only Southwest employees told him what specific work to do and when and where to do it. Lomeli stated that he never worked under the supervision of Labor Ready employees while at Southwest, and Maria Davila testified that Southwest does not allow employees of other companies to be supervisors in its shipyard. Davila also testified that Lomeli was under Southwest's supervision and that its employees told Lomeli which shift to work and which projects to complete. She also stated that Southwest supervisors had the right to tell a Labor Ready employee not to return to the shipyard if they were unsatisfied with the employee's job performance. Although Lomeli speculated that he would follow Labor Ready's instructions if they conflicted with Southwest's instructions, he presented no evidence beyond this speculation that Labor Ready ever gave him any specific instructions on what to do at Southwest and how to do the work that Southwest employees assigned to him, let alone any instructions that conflicted with South-

west's instructions.[2] Instead, the only instructions Labor Ready gave to Lomeli were to be at Southwest at 3:30 on November 13, 2007, and to perform the work assigned to him by the Southwest supervisors. *See Melancon,* 834 F.2d at 1245; *Capps,* 784 F.2d at 617; *cf. Brown,* 984 F.2d at 677 (holding that fact issue raised when Brown presented evidence that he was supervised by employee of his original employer and received instructions from that employee while working at Union Oil).

We conclude that Southwest "clearly had control over" Lomeli and the details of his work. *Melancon,* 834 F.2d at 1245. Labor Ready may have trained Lomeli and he may not have worn a Southwest uniform, but the evidence is undisputed that only Southwest employees instructed Lomeli regarding what tasks he was to perform and when and where he was to perform those tasks. This factor, therefore, weighs in favor of borrowed employee status.

### 2. Whose work was being performed?

The focus of this factor is whether the employee's work furthered the business of the "borrowing" employer. *See Capps,* 784 F.2d at 617 ("All of the work Capps performed furthered Baroid's business. In fact, Davis' business existed solely to furnish employees to other companies so that the employee could perform the work of the borrowing employer."); *see also Melancon,* 834 F.2d at 1245 ("[T]here can be no doubt that Amoco's work was being performed by Melancon. Melancon's work assisted Amoco in the production of hydrocarbons by maintaining the production

equipment and platforms in the Amoco field.").

Lomeli contends that he raised a fact issue on this factor because he testified that he was performing Labor Ready's work. Lomeli is technically correct: Labor Ready's business was to provide needed temporary workers to other companies such as Southwest. *See Capps,* 784 F.2d at 617 (noting that original employer's business was furnishing employees to other companies). While at Southwest, however, Lomeli worked as a welder to repair barges at the shipyard. Southwest's business was to clean, refurbish, and repair barges brought to it by its customers. By engaging in welding activities on the barges at Southwest, Lomeli's efforts furthered Southwest's business. *Id.; Melancon,* 834 F.2d at 1245. We conclude that this factor weighs in favor of borrowed employee status.

### 3. Was there an agreement or understanding between Southwest and Labor Ready?

In several of the Fifth Circuit's borrowed employee cases, the contract between the original and borrowing employers contained language either classifying the temporary employees as "independent contractors" or specifically providing that the temporary employees were not considered employees of the purported borrowing employer. *See Billizon,* 993 F.2d at 105–106 ("The service contract governing the relationship between Conoco and D & C provides that employees of D & C are *not* employees of Conoco.") (emphasis in original); *Brown,* 984 F.2d at 677 ("[Gulf

---

**2.** In *Brown v. Union Oil Co. of California,* the Fifth Circuit noted, while analyzing whether Brown raised a fact issue on the first *Ruiz* factor, that "[the original employer's] superintendent testified that if Brown was asked to do something against Gulf Inland's policies, Brown was instructed to call Gulf Inland to

deal with the conflict." 984 F.2d 674, 677 (5th Cir.1993). Lomeli presented no such evidence in this case, nor did he present evidence, contrary to his assertion on appeal, that Labor Ready "required" its employees to follow its instructions in the event of a conflict with Southwest's instructions.

Inland] specifically agrees that all persons employed by [Gulf Inland] in performing work covered by this contract ... are not employees of Union for any purposes whatsoever."); *Melancon*, 834 F.2d at 1245 ("Provision 6 of the 'Well and Lease Service Master Contract' does specify that no Beraud employee is to be considered the agent, servant, or representative of Amoco."); *Gaudet*, 562 F.2d at 358 (contract provides that original employer is "independent Contractor as to all work performed hereunder"). The Fifth Circuit has held, however, that worksite realities and the parties' actions in carrying out the contract can "impliedly modify, alter, or waive express contract provisions." *Melancon*, 834 F.2d at 1245; *see also Billizon*, 993 F.2d at 106 ("[T]he reality of the work site and the actions of Conoco and D & C suggest that [despite the contract provision] the two employers had the contrary 'understanding or meeting of the minds.'"). Furthermore, "parties to a contract cannot automatically prevent a legal status like 'borrowed employee' from arising merely by saying in a provision in their contract that it cannot arise." *Melancon*, 834 F.2d at 1245.

The Fifth Circuit has also repeatedly concluded that, even if the contract between the employers includes a provision prohibiting borrowed employee status, "summary judgment is appropriate when the remaining factors clearly point to borrowed-employee status." *Billizon*, 993 F.2d at 106; *Brown*, 984 F.2d at 678 n. 5 ("We recognize and reiterate that the terms of a contract and the related factual issues do not automatically prevent summary judgment or direct verdict. If the remaining borrowed employee factors overwhelmingly point to borrowed employee status, a summary judgment or direct verdict is appropriate."); *Alexander v. Chevron, U.S.A.*, 806 F.2d 526, 529 (5th Cir.1986) ("[T]he terms of the contract between the borrowing employer and payroll employer does not ordinarily provide a sufficient basis to deny summary judgment when the remaining *Ruiz* factors point toward borrowed servant status."); *Gaudet*, 562 F.2d at 358–59 (holding, despite contractual language, that "sufficient basic factual ingredients are undisputed to warrant the entry of summary judgment").

Lomeli argues that because Southwest failed to produce its contract with Labor Ready during discovery, the trial court should have applied a spoliation presumption that the contract language specifically negated borrowed employee status. According to Lomeli, this presumption precludes summary judgment, regardless of the balance of the remaining borrowed employee factors.

█ Even if Southwest failed to produce the relevant contract governing Lomeli's employment and, thus, a spoliation presumption was warranted, this presumption does not automatically preclude summary judgment. The Fifth Circuit has repeatedly found borrowed employee status to exist as a matter of law even when the contract between the employers provides that the worker is to be classified as an independent contractor or that the worker is not considered an employee of the borrowing entity. *See Billizon*, 993 F.2d at 106; *Melancon*, 834 F.2d at 1245 (holding that parties to contract cannot prevent borrowed employee status from arising by providing in contract that it cannot arise); *Gaudet*, 562 F.2d at 358–59; *see also Brown*, 984 F.2d at 678 n. 5 (stating that terms of contract do not automatically preclude summary judgment if remaining factors point to borrowed employee status). Furthermore, worksite realities and the parties' actions can "impliedly modify, alter, or waive express contract provisions." *Melancon*, 834 F.2d at 1245.

Assuming, without deciding, that the contract at issue here provided that Labor

Ready employees were to be considered independent contractors and not "employees" of Southwest, Southwest presented evidence that its supervisors instructed workers such as Lomeli, who worked alongside "general" Southwest employees, regarding their specific shifts, their specific tasks, and when and where to complete their assigned tasks. Lomeli agreed that while working at Southwest, he never received any instructions from Labor Ready employees and that he was never supervised by Labor Ready employees. Although Mark Aguilar, Southwest's Health and Safety Supervisor, testified that Lomeli received most of his training at Labor Ready, he also testified that upon arriving at Southwest, Lomeli received an hour of orientation with the Southwest safety division, and Southwest employees discussed safety policies and procedures with Lomeli. Regardless of any contractual language purporting to preclude borrowed employee status, we conclude that both Labor Ready and Southwest understood that Lomeli would receive his job-related instructions from Southwest and that Southwest would direct, control, and supervise the particulars of Lomeli's job performance. *See Billizon,* 993 F.2d at 106 ("However, the reality of the work site and the actions of Conoco and D & C suggest that the two employers had the contrary 'understanding or meeting of the minds.' "); *Melancon,* 834 F.2d at 1245 ("Beraud clearly understood that Melancon would be taking his instructions from Amoco, notwithstanding Provision 6 of the contract.").

### 4. Did the employee acquiesce in the new work situation?

The focus for this factor is not whether the employee acquiesced in his assignment to the borrowing employer, as Lomeli contends; rather, the focus is whether "the employee was aware of his work conditions [at the borrowing employer's facility] and

chose to continue working in them." *Brown,* 984 F.2d at 678; *Melancon,* 834 F.2d at 1246 ("[Melancon] knew when he began to work on Amoco's offshore platforms in 1977 what his work conditions would be, and he made no complaint regarding these conditions to Beraud or to Amoco."). In *Capps,* the Fifth Circuit found that Capps "acquiesced in the new work situation" even though he was injured at Baroid's facility on his first day of working there because Capps "worked for a company that loaned temporary employees." 784 F.2d at 617. Thus, Capps knew that Davis, his original employer, would send him into new work situations, and he "acquiesced to the fact that Davis would constantly send him into new work situations." *Id.* In *Brown,* the Fifth Circuit noted that Brown had worked at Union Oil for one month before his accident, and although most of its cases affirming a borrowed employee finding involved longer periods of work with the borrowing employer, "one month is a sufficient amount of time for Brown to appreciate the new work conditions." 984 F.2d at 678.

Here, as in *Brown,* Lomeli worked at Southwest for one month before his accident. Lomeli never complained about his work conditions to either Southwest or Labor Ready. *See Melancon,* 834 F.2d at 1246. Lomeli's subjective belief regarding which entity employed him is irrelevant to the analysis of this factor. We conclude, as the Fifth Circuit did in *Brown,* that one month is a sufficient amount of time for Lomeli to appreciate and acquiesce in his new work conditions at Southwest. *Brown,* 984 F.2d at 678; *see also Gaudet,* 562 F.2d at 357 ("But if an employee continues working in a new location, exposed to risks resulting from the direction and control of the new employer, there must come a time when policy dictates the LHWCA should apply, and the new employer, and new co-employees, should no

longer be considered third parties but a true employer and true co-employees, liable only under the LHWCA."). This factor, therefore, weighs in favor of borrowed employee status.

### 5. Did the original employer terminate its relationship with the employee?

When considering this factor, we emphasize "the lending employer's relationship with the employee while the borrowing occurs." *Brown,* 984 F.2d at 678; *Melancon,* 834 F.2d at 1246; *Capps,* 784 F.2d at 618. This factor "does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed employee' doctrine." *Melancon,* 834 F.2d at 1246; *Capps,* 784 F.2d at 617. We consider whether the original employer exercised control over the employee while he worked for the borrowing employer, whether the original employer placed restrictions on the borrowing employer regarding the employee's employment conditions, and whether the original employer could remove the employee from the job with the borrowing employer if the employee was needed elsewhere. *See Brown,* 984 F.2d at 679; *Capps,* 784 F.2d at 618.

Lomeli contends that this factor weighs heavily against a borrowed employee finding because it is undisputed that Labor Ready maintained an employment relationship with Lomeli. Southwest argues that this factor weighs in favor of a borrowed employee finding because Labor Ready did not direct, control, or supervise Lomeli while he worked at Southwest. We agree with Southwest.

The fact that Labor Ready did not terminate its employment relationship with Lomeli is not determinative and does not mandate a conclusion that this factor weighs against borrowed employee status. *Brown,* 984 F.2d at 678; *Melancon,* 834 F.2d at 1246; *Capps,* 784 F.2d at 617–18.

Although Lomeli testified that Labor Ready could reassign him to work at another company if necessary, Labor Ready's control over Lomeli was otherwise non-existent while he worked at Southwest. Labor Ready did not direct or supervise Lomeli's actions while at Southwest, and there is no evidence that Labor Ready placed conditions or restrictions on Southwest's use of Lomeli at its facility. *See Capps,* 784 F.2d at 618. We therefore conclude that while Lomeli worked at Southwest, Labor Ready had "temporarily terminated its relationship" with and had "nominal" control over Lomeli, and, thus, this factor also supports borrowed employee status. *See id.; Melancon,* 834 F.2d at 1246.

### 6. Who furnished the tools and place for performance?

The fact that the original employer or the employee himself provides some of the equipment used while working at the borrowing employer's facility does not preclude a finding in favor of borrowed employee status. *See Melancon,* 834 F.2d at 1246 (holding that, although Beraud provided welding machine and related equipment, Amoco provided consumables, transportation, food, lodging, and place of performance, and, thus, "the balance on this factor is in Amoco's favor"); *Velasco v. Amfels, Inc.,* 368 F.Supp.2d 656, 660 (S.D.Tex.2005) ("The fact that Plaintiff provided much of his own personal work gear does not indicate that he was not the borrowed employee of Amfels.").

Here, Labor Ready provided Lomeli with safety glasses and a hard hat. Lomeli testified that he owned the safety gloves, life jacket, welding mask, "stinger" for the welding machine, and hammer that he used. Lomeli also testified that Southwest provided the welding machine, the necessary rods, and "anything else that [he] needed to use." Mark Aguilar agreed that

Labor Ready provided its employees with general safety equipment; he also testified, however, that if a Labor Ready employee arrived at Southwest and did not bring safety equipment, Southwest would provide the needed equipment. It is undisputed that Southwest provided the "place for performance."

Although Labor Ready and Lomeli himself provided some of the tools and equipment that he needed to weld, this does not compel a determination that this factor weighs against borrowed employee status. *See Melancon,* 834 F.2d at 1246 (finding factor weighs in favor of borrowed employee status even though original employer provided welding machine and related equipment); *Velasco,* 368 F.Supp.2d at 660 (finding same when worker provided most of his personal work gear). Southwest provided the place for performance, the welding machine, and the rods for the machine, and it would provide safety equipment if Labor Ready or Lomeli himself did not otherwise provide such equipment. We conclude that "the balance on this factor" weighs in favor of borrowed employee status.[3] *See Melancon,* 834 F.2d at 1246.

### 7. Was the new employment over a considerable period of time?

The Fifth Circuit has held that this factor is significant "only when the [borrowing] employer employs the employee for a considerable length of time." *Capps,* 784 F.2d at 618. "[W]here the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; however, the con-

verse is not true." *Id.* In *Brown,* the Fifth Circuit concluded that Brown, who worked on Union Oil's platform for one month before his accident, did not work at Union Oil for a "considerable" period of time. 984 F.2d at 679. Based on the reasoning of *Capps,* the court held that this factor was neutral in the borrowed employee analysis. *Id.; see also Capps,* 784 F.2d at 618 ("When the employee's injury occurs on the first day, it does not follow that the employee is not a borrowed employee; therefore, the factor provides a neutral assessment in the instant case.").

Here, as in *Brown,* Lomeli worked at Southwest for approximately one month before his accident. Although Lomeli did not work at Southwest for a considerable period of time, we conclude that this factor is neutral in the borrowed employee analysis. *See Brown,* 984 F.2d at 679.

### 8. Who had the right to discharge the employee?

The "proper focus" of this inquiry is not whether the borrowing employer could discharge the employee from his employment with the original employer, but whether the borrowing employer "had the right to terminate [the employee's] services with itself." *Capps,* 784 F.2d at 618 (citing *Hebron v. Union Oil Co. of Cal.,* 634 F.2d 245 (5th Cir.1981) (per curiam)); *see also Brown,* 984 F.2d at 679 ("Although Union did not have the right to terminate Brown's employment with Gulf Inland, it had the right to terminate Brown's work relationship with Union. This arrangement is sufficient to support a finding of borrowed servant status."); *Melancon,* 834

---

**3.** Lomeli notes that it is undisputed that Southwest did not provide his "transportation, lodging, [or] food." All of the cases in which the Fifth Circuit has considered whether the borrowing employer provided these particular items involved the employee working on an offshore platform. *See, e.g., Billizon v. Conoco, Inc.,* 993 F.2d 104, 105 (5th

Cir.1993). Southwest is located in Channelview on the San Jacinto River off of Interstate 10, and Lomeli testified in his deposition that he lives in Houston. Under these circumstances, the fact that Southwest did not provide transportation to its facility, lodging, or food to Lomeli is irrelevant.

F.2d at 1246 ("Amoco also had the right to discharge Melancon even though Amoco could not terminate Melancon's employment with Beraud. Amoco's right to terminate Melancon's services in the Amoco field satisfied this requirement.").

Here, it is undisputed that Southwest could not terminate Lomeli's employment relationship with Labor Ready; however, both Wayne Herman and Maria Davila testified that Southwest could end its relationship with Lomeli at any time.[4] Herman specifically averred that: "Labor Ready workers assigned to [Southwest] are assigned to work at [Southwest's] facility for an indefinite period of time. [Southwest] has the right to terminate said assigned workers from working at Southwest's facility." Davila testified that if a Labor Ready employee was performing his assigned tasks at Southwest poorly, this fact would not be brought to her attention as the Human Resources Manager, but she unequivocally stated that Southwest supervisors had the right to tell a Labor Ready employee not to return to the shipyard if they were not satisfied with the worker's performance. Lomeli also testified that he understood that he would continue working at Southwest until "somebody at Southwest Shipyard felt that they didn't need [him] anymore." Thus, Lomeli agreed that Southwest could discharge him when it no longer had a job available for him to perform.

We conclude that although Southwest could not terminate Lomeli's employment relationship with Labor Ready, it could terminate Lomeli's relationship with itself. *See Brown*, 984 F.2d at 679; *Melancon*,

834 F.2d at 1246; *Capps*, 784 F.2d at 618. This factor, therefore, weighs in favor of borrowed employee status.

**9. *Who had the obligation to pay the employee?***

The focus under this factor is not on which entity physically paid the employee; rather, we consider which entity furnished the funds from which the employee was paid. *See Melancon*, 834 F.2d at 1246 ("Amoco furnished the funds from which Beraud paid Melancon, and this is the determinative inquiry for this factor."). This factor supports borrowed employee status when the original employer pays the employee "based on time tickets that had to be verified daily by [the borrowing employer]." *Brown*, 984 F.2d at 679; *Billizon*, 993 F.2d at 105 ("D & C paid Billizon, but his pay was based on time tickets verified by Conoco."); *Capps*, 784 F.2d at 618 ("While Davis had the obligation to pay Capps, Davis received the funds to pay Capps from Baroid. Since Baroid paid Davis at an hourly rate for Capps' work, and then Davis paid Capps at a lower hourly rate, Baroid in essence paid Capps.").

It is undisputed that Labor Ready physically furnished Lomeli each of his paychecks and that he never received a paycheck directly from Southwest. Lomeli also testified, however, that his supervisors at Southwest had to sign the work tickets that he returned to Labor Ready. These tickets reflected the number of hours that he worked each day. Lomeli agreed that if a Southwest employee did not verify his work ticket, he would not get paid for his

---

4. As support for his contention that Southwest could not fire Labor Ready employees, Lomeli cites to the following deposition testimony from Maria Davila:

Q: But when a Labor Ready employee has performance issues, you can't terminate his employment, fair?

A: I'm not involved with Labor Ready people.

Davila is the Human Resources Manager for Southwest. Her later deposition testimony reflects that although *she* would not deal with a poor performance issue, a Southwest supervisor could tell a Labor Ready employee not to return to the yard.

work on that day. Wayne Herman averred that Southwest paid Labor Ready the "funds that are used to pay those individuals that are assigned to [Southwest]" and that the paychecks issued by Labor Ready are "the extent of Labor Ready's involvement with the workers while they are at Southwest's facility."

We conclude that although Labor Ready physically paid Lomeli, his pay was based on work tickets that had to be verified daily by Southwest employees. Southwest paid Lomeli's wages via Labor Ready based on the number of hours that Lomeli worked each day at Southwest. Because Southwest furnished the funds from which Labor Ready paid Lomeli, we conclude that this factor weighs in favor of borrowed employee status. *See Brown,* 984 F.2d at 679; *Melancon,* 834 F.2d at 1246; *Capps,* 784 F.2d at 618.

### 10. Balance of borrowed employee factors

Even if we assume that the third factor—whether there was an agreement, understanding, or meeting of the minds between the original and the borrowing employer—weighs against a borrowed employee finding and that the seventh factor—whether the new employment was over a considerable period of time—is neutral in the analysis, the remaining factors weigh in favor of borrowed employee status. We conclude that the summary judgment record establishes that Lomeli was Southwest's borrowed employee. *See Billizon,* 993 F.2d at 106 (finding borrowed employee status satisfied even though third factor weighed against finding and seventh factor was neutral); *see also Brown,* 984 F.2d at 678 n. 5 ("We recognize and reiterate that the terms of a contract and the related factual issues do not automatically prevent summary judgment or direct verdict. If the remaining borrowed employee factors overwhelmingly point to borrowed employee

status, a summary judgment or direct verdict is appropriate."). We therefore hold that the trial court correctly rendered summary judgment in favor of Southwest.

We overrule Lomeli's sole issue.

### Conclusion

We affirm the judgment of the trial court.