**Motion for Rehearing Denied As Moot; Majority and Dissenting Opinions of June 26, 2018, Withdrawn; Reversed and Remanded and Substitute Majority and Dissenting Opinions filed October 30, 2018.**



In The

# Fourteenth Court of Appeals

### NO. 14-16-00511-CV

### WESLEY FREDIEU, Appellant

### V.

### W&T OFFSHORE, INC., Appellee

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-06933**

## S U B S T I T U T E   M A J O R I T Y   O P I N I O N

We deny W&T Offshore Inc.'s motion for rehearing as moot. We withdraw the majority opinion issued in this case on June 26, 2018, and we issue this substitute majority opinion in its place.

Wesley Fredieu challenges the trial court's take-nothing judgment following a jury trial in connection with an injury he sustained while working on an offshore

platform in the Gulf of Mexico.

The jury found that W&T Offshore Inc.'s negligence proximately caused Fredieu's injury and awarded damages totaling more than $1.7 million. The jury answered "No" to a question asking whether Fredieu was W&T Offshore's "borrowed employee" at the time of the injury.

The trial court signed a take-nothing judgment after disregarding the jury's "No" answer to the borrowed employee question; determining that Fredieu was W&T Offshore's borrowed employee as a matter of law; and concluding that "the borrowed-employee doctrine applies and bars Mr. Fredieu's tort claims" because Fredieu's sole remedy as W&T Offshore's borrowed employee is to pursue compensation benefits under the Longshore and Harbor Workers' Compensation Act (LHWCA).

We reverse the trial court's take-nothing judgment because disputed fact issues pertaining to Fredieu's status preclude a matter-of-law determination that Fredieu was W&T Offshore's borrowed employee. It was the jury's province to resolve these fact issues, and the jury did so by answering "No" to the charge question asking whether Fredieu was a borrowed employee at the time of his injury. Legally sufficient evidence supports the jury's "No" answer. Additionally, legally and factually sufficient evidence supports the jury's award for future lost earning capacity based on Fredieu's physical limitations following his injury.

## BACKGROUND

Fredieu's injury occurred while he worked on the Ship Shoal 149-D ("Platform D"), a fixed platform located on the outer Continental Shelf in the Gulf of Mexico off the Louisiana coast.

Platform D is owned by W&T Offshore, which signed a Master Service

2

Contract with The Wood Group to perform platform service and maintenance work. The Wood Group employed Fredieu as an offshore platform operator.

Fredieu was assigned to another platform owned by W&T Offshore called the Ship Shoal 149-A ("Platform A"). He left Platform A on the morning of October 20, 2011, and traveled ten minutes by boat to Platform D. Fredieu was accompanied by three employees from another contract company hired to make welding repairs to handrails on Platform D. No W&T Offshore employees were present on Platform D.

After supervising the welding repairs and breaking for lunch, Fredieu performed a "walk around" safety inspection on Platform D and noticed a malfunction in a piece of equipment called a "regulator."

As Fredieu was disconnecting the regulator to bring it back to Platform A for repair, a nearby one-inch pipe separated under high pressure and struck him. The blow knocked Fredieu off his feet; caused fractures in both bones of his left forearm; and necessitated surgery to repair multiple fractures with two metal plates and 13 screws.

Fredieu filed an original petition in Harris County district court in February 2013 invoking general maritime law and asserting a negligence claim against W&T Offshore in connection with his injury. At the close of a four-day trial in August 2015, the jury answered a series of jury charge questions in Fredieu's favor.

The jury answered "Yes" as to W&T Offshore and "No" as to Fredieu in response to Question No. 1, which asked: "Did the negligence, if any, of either of those named below proximately cause the injury in question?" The jury did not answer Question No. 2, which asked it to apportion the percentage of responsibility attributable to W&T Offshore and Fredieu only if it answered "Yes" as to both in

response to Question No. 1.

The jury awarded individual dollar amounts for 12 separate categories of Fredieu's past and future damages in response to Question No. 3. The amounts are $100,000 for past physical pain; $75,000 for physical pain that, in reasonable probability, Fredieu will sustain in the future; $85,000 for past mental anguish; $75,000 for mental anguish that, in reasonable probability, Fredieu will sustain in the future; $100,000 for past physical impairment; $50,000 for physical impairment that, in reasonable probability, Fredieu will sustain in the future; $93,000 in past lost earning capacity; $950,000 in lost earning capacity that, in reasonable probability, Fredieu will sustain in the future; $25,000 for past disfigurement; $25,000 for disfigurement that, in reasonable probability, Fredieu will sustain in the future; $28,000 in past medical expenses; and $142,000 in medical expenses that, in reasonable probability, Fredieu will incur in the future.

The jury answered "No" in response to Question No. 4, which reads as follows:

**Question No. 4**

At the time of the injury in question, was Wesley Fredieu the borrowed employee of W&T?

Factors to consider in determining whether Mr. Fredieu was the borrowed employee of W&T include

1) Who had the right of control over Mr. Fredieu and the work he was performing, beyond mere suggestion of details or cooperation?

2) Whose work was Mr. Fredieu performing?

3) Was there an agreement, understanding, or meeting of the minds between Wood Group and W&T?

4) Did Mr. Fredieu acquiesce in the new work situation before the injury in question?

5) Did Wood Group terminate its relationship with Mr. Fredieu

4

before the injury in question?

6) Who furnished the tools and place for employment?

7) Was the new employment over a considerable length of time?

8) Who had the right to terminate Mr. Fredieu's services on the platforms in question?

9) Who had the obligation to furnish the funds from which Mr. Fredieu was paid?

Answer "Yes" or "No"

Answer     <u>NO</u>

The nine factors listed in Question No. 4 track those set out in *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir. 1969), for determining borrowed employee status under the LHWCA.

Fredieu filed a motion for entry of judgment in his favor in conformity with the jury's verdict. W&T Offshore filed "Defendant's Motion to Disregard Jury Findings, For Determination of Borrowed-Employee Status as a Matter of Law, and for Entry of a Take-Nothing Judgment." This motion asked the trial court to disregard the jury's "No" answer to Question No. 4 on grounds that this answer is immaterial and unsupported by the evidence. *See* Tex. R. Civ. P. 301.

W&T Offshore argued that the jury's "No" answer to Question No. 4 should be disregarded because (1) "[t]he determination of borrowed employee status is a question of law;" (2) there are no factual disputes in this case "on discrete issues pertaining to the issue of borrowed employee status . . . [that] require specific fact findings;" (3) Fredieu "did not request specific fact findings on any particular issues relating to his borrowed employee status — instead the jury was asked a general, all-encompassing question on this legal issue;" and (4) even when fact issues on particular borrowed employee factors are present, judgment as a matter of law on this issue nonetheless is appropriate when the remaining factors point

5

overwhelmingly to borrowed employee status.

The parties filed many subsequent supplements, responses, and replies during several months of extended post-verdict briefing addressing borrowed employee status.

The trial court granted W&T Offshore's motion, disregarded the jury's "No" answer to Question No. 4, and explained its basis for doing so in a Memorandum Opinion and Order signed on March 29, 2016.

The trial court's opinion states that "W&T Offshore — the Party bearing the burden of proof and persuasion on the borrowed-employee doctrine — failed to request a jury question, let alone obtain a jury finding, on any individual factor." It further states that "W&T Offshore did request (and the Court granted) a *broad-form* question asking whether Mr. Fredieu was W&T Offshore's borrowed employee, but W&T did not request any *special-issue* questions on any of the individual *Ruiz* factors. As a result, W&T Offshore failed to obtain any jury findings on any individual factors."

The trial court's opinion notes that "neither W&T Offshore nor Mr. Fredieu objected to the omission of a question on any individual *Ruiz* factor. As a result, the court may make a finding on any omitted factors for which there is conflicting evidence." In support of this conclusion, the opinion cited Texas Rule of Civil Procedure 279 and *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002).

After analyzing the evidence concerning individual *Ruiz* factors for determining borrowed employee status, the trial court stated as follows: "The Court concludes that the balance of the *Ruiz* factors favor concluding that Mr. Fredieu was the borrowed employee of W&T Offshore. As a result, the exclusive-remedy provision of the LHWCA applies, and Mr. Fredieu's sole remedy against W&T

6

Offshore is recovery of workers' compensation benefits under the LHWCA." The Memorandum Opinion and Order contains 12 findings of fact pertaining to individual *Ruiz* factors.

The trial court signed a take-nothing final judgment in conformity with its Memorandum Opinion and Order, and Fredieu timely appealed.

## ANALYSIS

No extended discussion is needed concerning precisely how a one-inch pipe separated under high pressure on Platform D and struck Fredieu. This is so because W&T Offshore does not contest the jury's finding that its negligence proximately caused Fredieu's injury.

The appellate fight focuses instead on W&T Offshore's affirmative defense that no tort liability attaches because Fredieu was acting as its LHWCA borrowed employee when the injury occurred on Platform D.

The parties do not challenge on appeal the trial court's determinations that (1) "there was a substantial nexus between Mr. Fredieu's injury and operations to extract natural resources from the outer continental shelf;" and (2) "[a]s a result, under the [Outer Continental Shelf Lands Act] . . . the LHWCA applies" to Fredieu's claim. *See generally Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207, 222 (2012). Based on these determinations, the trial court applied "the version of the borrowed-employee doctrine developed by the federal courts under the LHWCA." The parties do the same.

The parties also do not dispute that the LHWCA provides Fredieu's exclusive remedy if he was working as W&T Offshore's borrowed employee at the time of his injury. *See Lomeli v. Sw. Shipyard, L.P.*, 363 S.W.3d 681, 685-86 (Tex. App.— Houston [1st Dist.] 2011, no pet.) ("Under the LHWCA, an employer's liability is

limited to workers' compensation benefits under the act . . . ."); *see also White v. Bethlehem Steel Corp.*, 222 F.3d 146, 149 (4th Cir. 2000) (The definition of "employer" under the LHWCA "encompasses both general employers and employers who 'borrow' a servant from that general employer."); *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1243 (5th Cir. 1988) (same).

The inquiry into Fredieu's LHWCA borrowed employee status focuses on the nine *Ruiz* factors incorporated in the instruction accompanying Question No. 4.

Fredieu contends the trial court erred in disregarding the jury's "No" answer to Question No. 4 regarding borrowed employee status; determining that Fredieu was a borrowed employee as a matter of law; and signing a take-nothing judgment after concluding that "the borrowed-employee doctrine applies and bars Mr. Fredieu's tort claims against Defendant W&T Offshore, Inc." Fredieu raises the following appellate issues.

1. The trial court erred in disregarding the jury's "No" answer to Question No. 4 by which the jury failed to find that Fredieu was W&T Offshore's borrowed employee.

2. The trial court erred by ruling that *Ruiz* factors 1, 8, and 9 support a borrowed employee determination when the evidence on these disputed factors supported the jury's "No" answer to Question No. 4.

3. The trial court improperly worded the jury instructions on the *Ruiz* factors regarding right to discharge and obligation to pay.

W&T Offshore raises a conditional cross-point asserting that legally and factually insufficient evidence supports the jury's finding in answer to Question No. 3(h) that Fredieu in reasonable probability will sustain $950,000 in future lost earning capacity because of his injury. *See* Tex. R. App. P. 25.1. W&T Offshore does not

8

challenge the sufficiency of the evidence supporting the remaining $798,000 awarded for Fredieu's past and future damages.

We address these issues in turn.

## I. Waiver and Rule 279's Applicability

Fredieu makes two threshold procedural arguments in conjunction with his first issue.

First, he argues that W&T Offshore waived the affirmative defense of borrowed employee by failing to request or obtain jury findings on individual *Ruiz* factors. Second, he argues that the trial court erred in applying Texas Rule of Civil Procedure 279 and concluding the court could make fact findings on disputed factors pertaining to borrowed employee status.

These two arguments are intertwined because the application of charge error waiver standards and Rule 279 depends on how the underlying contentions are framed.

The trial court noted that (1) W&T Offshore requested a broad-form charge with a single yes-or-no answer blank for Question No. 4, which asked whether Fredieu was a borrowed employee at the time of his injury; (2) W&T Offshore did not request individual answer blanks for each *Ruiz* factor listed in the accompanying instruction; and (3) neither W&T Offshore nor Fredieu objected at trial to the omission of individual answer blanks on each *Ruiz* factor. Based on these circumstances, the trial court concluded that Rule 279 allowed it to "make a finding on any omitted factors for which there is conflicting evidence."

Fredieu argues initially that W&T Offshore waived any error in the broad-form submission of Question No. 4 because it did not request specific findings on individual *Ruiz* factors or object to the absence of specific findings at the charge

9

conference.

W&T Offshore argues that no waiver occurred because it does not challenge on appeal the use of broad-form submission with a single yes-or-no answer blank for Question No. 4 — a complaint regarding the charge's format. *See* Tex. R. Civ. P. 274, 277; *see also Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387-88 (Tex. 2000).

Instead, W&T Offshore contends that the jury's "No" answer to Question No. 4 properly was disregarded because (1) borrowed employee status "involves a question of law beyond the province of the jury," which means the jury's answer to Question No. 4 is immaterial; and (2) "regardless of whether the question is one of law or of fact, the evidence conclusively established a borrowed-employee relationship." W&T Offshore raised both contentions in its post-trial Rule 301 motion.

We agree with W&T Offshore that no waiver occurred.

A "no evidence" or "established as a matter of law" contention regarding evidentiary sufficiency to support a jury's answer can be preserved via charge objection. *See, e.g., T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220 (Tex. 1992). But that is not the only available mechanism; this contention also can be preserved after trial by raising it in a Rule 301 motion to disregard a particular jury answer based on legal insufficiency of the evidence. *Id.; see also Aero Energy, Inc. v. Circle C Drilling Co.*, 699 S.W.2d 821, 822 (Tex. 1985). Further, a Rule 301 motion is a proper vehicle for preserving a contention that a particular jury answer should be disregarded as immaterial because the question impermissibly called on the jury to answer a question of law. *See White Oak Operating Co. v. BLR Constr. Cos.,* 362 S.W.3d 725, 729 n.1 (Tex. App.—Houston [14th Dist.] 2011, no pet.); *Ballesteros v. Jones*, 985 S.W.2d 485, 499 (Tex. App.—San Antonio 1998, pet.

10

denied).

W&T Offshore's Rule 301 motion preserved its appellate contentions that the jury's "No" answer to Question No. 4 should be disregarded on grounds that it is immaterial and unsupported by any evidence. *See C. & R. Transp., Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966) ("A jury's answer to a special issue may be disregarded only when it has no support in the evidence or when the issue is immaterial."). W&T Offshore did not waive these contentions.

At the same time, we agree with Fredieu's contention that Rule 279's omitted element mechanism does not apply here because these circumstances involve neither elements nor omissions.

Rule 279 states in part as follows:

When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment.

Although Rule 279's run-on sentence is not a model of clarity, focusing on the key term "elements" demonstrates that the rule does not apply here in circumstances involving a jury question that submitted all pertinent factors in a flexible, multi-factor balancing test.

Elements are necessary components of a viable cause of action or defense under a particular theory. *See, e.g., Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529-30 (Tex. 1997) ("Because premises defect cases and negligent activity cases are based on independent theories of recovery, a simple negligence

11

question, unaccompanied by the *Corbin* elements as instructions or definitions, cannot support a recovery in a premises defect case.") (citing *Keetch v. Kroger Co.*, 845 S.W.2d 262, 265-66 (Tex. 1992); *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259-59 (Tex. 1992); and *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 296 (Tex. 1983)).

"Rule 279 . . . directs courts how to proceed when an element of a 'ground of recovery or defense' is omitted from a jury charge." *In re J.F.C.*, 96 S.W.3d at 263. "[W]hen some but not all elements of a claim or cause of action are submitted to and found by a jury, and there is no request or objection with regard to the missing element, a trial court may expressly make a finding on the omitted element . . . ." *Id.* at 262. "[I]f it does not, the omitted element is deemed found by the court in a manner supporting the judgment if the deemed finding is supported by some evidence." *Id.* at 262-63.

The parties have identified no case in which Rule 279's deemed finding mechanism for supplying missing "elements necessary to sustain [a] . . . ground of recovery or defense" has been applied to a flexible, multi-factor balancing test such as Question No. 4's borrowed employee instruction.

Rule 279's deemed finding mechanism does not fit the circumstances here because no single *Ruiz* factor is an "element[] necessary to sustain" W&T Offshore's borrowed employee defense. *See West v. Kerr-McGee Corp.*, 765 F.2d 526, 531 (5th Cir. 1985) ("neither control nor any other single answer to the inquiries 'is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship.'") (quoting *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 376 (5th Cir. 1985)); *see also Ruiz*, 413 F.2d at 312.

Even if we were to equate flexible "factors" with necessary "elements," Rule 279's deemed finding mechanism still does not fit the circumstances here because

12

the charge did not omit any *Ruiz* factors concerning borrowed employee status.

The instruction accompanying Question No. 4 includes all nine *Ruiz* factors. The absence of individual answer blanks for individual factors does not mean that Question No. 4 failed to submit these factors to the jury. The presence or absence of individual answer blanks for individual factors goes to a different inquiry regarding whether broad-form submission of Question No. 4 is "feasible" under Texas Rule of Civil Procedure 277. *See Crown Life Ins. Co.*, 22 S.W.3d at 387-88. Neither party asserts that the trial court committed charge error by submitting a single yes-or-no answer blank in Question No. 4 because (1) broad-form submission was not feasible; and (2) individual answers for individual factors therefore were necessary. The absence of individual answer blanks does not drive the analysis here because the parties do not challenge the feasibility of broad-form submission.

It follows that the circumstances here do not authorize fact finding by the trial court with respect to Fredieu's borrowed employee status. Accordingly, we do not address whether sufficient evidence supports (1) the trial court's independent findings on individual *Ruiz* factors in its March 29, 2016 Memorandum Opinion and Order; or (2) its independent determination that, when all of the *Ruiz* factors are considered on balance, Fredieu was W&T Offshore's borrowed employee at the time of his injury.

We focus instead on whether sufficient evidence supports the jury's single "No" answer to Question No. 4. This "No" answer is a failure to find that Fredieu was a borrowed employee in response to a jury question that properly placed the burden of proof for obtaining an affirmative answer on W&T Offshore.

Fredieu contends that the trial court erred by disregarding the jury's single "No" answer to Question No. 4 under Rule 301 because that answer was material and supported by sufficient evidence when all of the *Ruiz* factors are considered on

balance. W&T Offshore counters that the trial court properly disregarded the jury's single "No" answer to Question No. 4 because it submitted a question of law and "[t]here were no discrete factual issues that required jury findings" with respect to the factors pertaining to borrowed employee status; it also contends that "[t]he evidence at trial conclusively established" Fredieu's status as W&T Offshore's borrowed employee when he was injured.

We discuss these contentions below in the course of addressing Fredieu's first and second issues.

## II. Determination of Borrowed Employee Status

### A. Is Question No. 4 Immaterial Because it Submits a Question of Law?

W&T Offshore initially contends that the trial court properly disregarded the jury's answer to Question No. 4 as immaterial under Rule 301 because "[f]ederal law renders Fredieu's borrowed-employee status a legal question, not a fact question." W&T Offshore further argues that "the question of whether Fredieu was W&T's borrowed employee is a question of *law*, not a question of *fact* for a jury." We reject this contention on this record.

"The issue of borrowed employee status is generally a question of law for the trial court, but 'some cases involve factual disputes and those cases require findings by the fact finder.'" *Lomeli*, 363 S.W.3d at 686 (quoting *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 677 (5th Cir. 1993) (per curiam)).

Factual disputes can exist with respect to the underlying bases for findings on individual factors. *See, e.g., Brown*, 984 F.2d at 677 ("In the instant case, factual findings concerning the first and third factors should have been made prior to the district court's determination of borrowed employee status."); *see also West*, 765 F.2d at 531; *Alday*, 750 F.2d at 378. A factual dispute also can exist when some of

14

the *Ruiz* factors weigh in favor of a borrowed employee finding and other factors weigh against such a finding. *See West*, 765 F.2d at 531 (citing *Alday*, 750 F.2d at 376-78).

Depending on the record and the circumstances surrounding a particular relationship, resolution of the borrowed employee inquiry sometimes can be accomplished without submission to a fact finder at trial. *See, e.g., Gaudet v. Exxon Corp.*, 562 F.2d 351 (5th Cir. 1977) (affirming summary judgment for the defendant despite an express contract clause disclaiming borrowed employee status because all other factors overwhelmingly established the plaintiff's status as Exxon's borrowed employee while working on an Exxon platform), *cert. denied,* 436 U.S. 913 (1978); *see also Lomeli*, 363 S.W.3d at 694 ("Even if we assume that the third factor . . . weighs against a borrowed employee finding and that the seventh factor . . . is neutral in the analysis, the remaining factors weigh in favor of borrowed employee status. We conclude that the summary judgment record establishes that Lomeli was Southwest's borrowed employee.").

And, depending on the record and the circumstances surrounding a particular relationship, resolution of the borrowed employee inquiry sometimes requires submission to a fact finder at trial. *See, e.g., Brown*, 984 F.2d at 679 ("[T]he contract provision between the two employers weighs against borrowed employee status, and the remaining factors do not overwhelmingly show that Brown was a borrowed employee. Important factual questions need to be resolved, including: (1) Who gave Brown instructions on how and when to clean the platform? (2) What was the agreement or understanding between Union and Gulf Inland regarding borrowed employee status?").

For this reason, we cannot agree with W&T Offshore's initial contention that "the jury's finding in response to the borrowed employee question was properly

15

disregarded as immaterial because it involves a question of law beyond the province of the jury" in all circumstances. Determining whether borrowed employee status is treated as a question of law or fact in any given case requires analysis of evidence pertaining to individual factors.

W&T Offshore argues on rehearing that, because borrowed employee status is denominated as a "question of law" under federal law, the trial court always is "tasked with deciding this ultimate question" regarding the existence or absence of this status. According to W&T Offshore, federal law dictates that the consideration of all *Ruiz* factors on balance to arrive at a "yes" or "no" answer to "this ultimate question" can be accomplished only by the trial court making the decision as a matter of law — even if threshold fact disputes exist regarding individual *Ruiz* factors. W&T Offshore contends that "***this legal question is not submitted to a jury***" (original emphasis). It further contends that, if any fact issues do exist on this record with respect to individual *Ruiz* factors, then the proper disposition here is to remand for a new trial at which (1) the jury makes fact findings on disputed individual *Ruiz* factors, and (2) the trial court subsequently makes a matter-of-law determination regarding Fredieu's ultimate borrowed employee status based on the trial court's balancing of all *Ruiz* factors as found by the jury and stipulated by the parties.

As discussed more fully below, we conclude that genuine and material fact issues requiring jury resolution exist as to three of the nine *Ruiz* factors. Therefore, jury submission was required. W&T Offshore's position on rehearing is in essence an argument that individual answer blanks for each *Ruiz* factor should be submitted to the jury rather than a single "yes" or "no" answer blank at the end of Question 4. W&T Offshore's position on rehearing is at odds with its position at trial, during which the trial court submitted Question No. 4 to the jury in broad form with a single "yes" or "no" answer blank. The trial court submitted Question No. 4 in this manner

16

at W&T Offshore's request and without objection.

The legal-vs-factual characterization of borrowed employee status in this case arises at the intersection of federal substantive law as applied in light of Texas state court jury charge practice. We address the parties' dispute about the proper characterization of this inquiry in light of (1) the existence of fact disputes regarding individual *Ruiz* factors; and (2) the manner in which W&T Offshore asked the trial court to submit Question No. 4 to the jury. For these reasons, W&T Offshore's contentions on rehearing do not require a different approach.

### B.    Sufficiency of the Evidence Supporting the Jury's "No" Answer to Question No. 4

#### 1.    Standard of review

The jury answered "No" to Question No. 4 asking whether Fredieu was a borrowed employee — an affirmative defense on which W&T Offshore bore the burden of proof. *See Lomeli*, 363 S.W.3d at 685.

Fredieu contends that the trial court erred in disregarding the jury's "No" answer to Question No. 4 based on W&T Offshore's Rule 301 motion, which challenged the legal sufficiency of the evidence supporting this "No" answer. "To successfully challenge the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, such as an affirmative defense, a party must conclusively establish all vital facts in support of that issue." *WCW Int'l, Inc. v. Broussard*, Nos. 14-12-00940-CV, 14-12-01077-CV, 14-12-01139-CV, 2014 WL 2700892, at *3 (Tex. App.—Houston [14th Dist.] June 3, 2014, pet. denied) (mem. op.) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam)).

In applying this standard, we consider whether the evidence adduced at trial

would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We look at the evidence in the light most favorable to the verdict and indulge every reasonable inference to support it. *Id*. at 822. We credit favorable evidence if a reasonable juror could do so and disregard contrary evidence if a reasonable juror could not credit it. *Id*. at 827. If the evidence falls within the zone of reasonable disagreement, we may not invade the role of the fact finder, who alone determines the credibility of the witnesses, the weight to give their testimony, and whether to accept or reject all or any part of that testimony. *Id*. at 822.

The parties' contentions require us to address how these well-established standards for assessing legal sufficiency of the evidence apply when the jury determination at issue involves a multi-factor balancing test.

For his part, Fredieu points to "the existence of disputed evidence" on multiple *Ruiz* factors. Based on these asserted factual disputes, he contends that "borrowed-employee status was not a pure legal question that should have been submitted to the court." Additionally, Fredieu argues that "Texas law . . . did not allow the trial court to disregard the jury's answer to the borrowed-employee question because it is supported by substantial evidence."

W&T Offshore argues that "[t]he evidence relevant to the borrowed-employee factors in this case is not conflicting. The parties simply disagree about what conclusion the trial court should have reached after weighing the factors." According to W&T Offshore, "[T]here were no discrete factual issues in this case that required submission to or resolution by the jury. The only dispute was over how the facts should be weighed to determine whether Fredieu was W&T's borrowed employee under the LHWCA, which is a question of law." W&T Offshore further argues that "[t]he evidence at trial conclusively established Fredieu was W&T's

18

borrowed employee."

Research has not revealed any Texas cases undertaking legal sufficiency review in connection with a jury determination based on the nine *Ruiz* factors for determining LHWCA borrowed employee status. The Fifth Circuit has characterized the balancing of *Ruiz* factors as an assessment of the "[t]otality of the [c]ircumstances." *Johnson v. PPI Tech. Servs., L.P.*, 605 F. App'x 366, 372 (5th Cir. 2015) (per curiam). Texas law also employs a multi-factor, totality-of-the-circumstances approach to address determinations in certain circumstances. They include determining the existence of a partnership based on five factors identified in the Texas Revised Partnership Act. *See Ingram v. Deere*, 288 S.W.3d 886, 898 (Tex. 2009); *see also* Tex. Bus. Orgs. Code Ann. § 152.051(b) (Vernon 2012).

Our analysis is informed by *Ingram*'s discussion of legal sufficiency review in an analogous totality-of-the-circumstances situation, which provides some measure of guidance for the inquiry here. According to *Ingram*, legal sufficiency review of a jury determination based on a multi-factor test involves consideration of evidence along a "continuum" and a "spectrum."

At one end of this spectrum, "an absence of any evidence of the factors will preclude the recognition of a partnership under Texas law." *Ingram*, 288 S.W.3d at 898. "Even conclusive evidence of only one factor normally will be insufficient to establish the existence of a partnership." *Id*. "On the other end of the spectrum, conclusive evidence of all of the . . . factors will establish the existence of a partnership as a matter of law." *Id*. "The challenge of the totality-of-the-circumstances test will be its application between these two points on the continuum." *Id*.

*Ingram*'s resolution did not require the court to identify a mid-continuum tipping point at which the balance of competing and controverted factors provides

legally sufficient evidence to support a fact finder's determination under a totality-of-the-circumstances standard. *Compare Ingram*, 288 S.W.3d at 904 ("In this case, Deere has not provided legally sufficient evidence of any of the five TRPA factors to prove the existence of a partnership."), *with Lentz Eng'g, L.C. v. Brown*, No. 14-10-00610-CV, 2011 WL 4449655, at *4 (Tex. App.—Houston [14th Dist.] Sept. 27, 2011, no pet.) (mem. op.) (legally sufficient evidence supported finding after bench trial that no partnership existed; intent evidence was controverted, and uncontroverted evidence of profit splitting and shared control did not conclusively establish existence of partnership under totality-of-the-circumstances standard).

We apply *Ingram*'s "spectrum" and "continuum" approach to our legal sufficiency review in connection with the *Ruiz* factors discussed below. We also review these factors in light of *Lomeli*, 363 S.W.3d at 694, which affirmed a defense summary judgment after concluding that seven of the nine *Ruiz* factors supported borrowed employee status for the plaintiff.

### 2. Applying the standard

Fredieu conceded in the trial court that *Ruiz* factors two, four, and seven weigh in favor of a determination that Fredieu was W&T Offshore's borrowed employee when he was injured. These conceded factors address whose work Fredieu was performing at the time of the injury (W&T Offshore's); whether he acquiesced in the new work situation before the injury (he did); and whether the new employment was over a "considerable length of time" (it was). Fredieu also conceded that one aspect of factor six weighs in favor of borrowed employee status because W&T Offshore furnished the place of employment — Platform D — where Fredieu was working when the injury occurred.

Fredieu and W&T Offshore vigorously dispute the evidentiary foundation

underlying the remaining *Ruiz* factors.  They also dispute how the *Ruiz* factors play out on balance when considering the totality of the circumstances existing at the time of Fredieu's injury on Platform D.

### a.     Factor one:  control

As noted earlier, "no one of [the] . . . factors, or any combination of them, is decisive, and no fixed text is used to determine the existence of a borrowed-servant relationship" under the LHWCA.  *Ruiz*, 413 F.2d at 312.  Despite this observation, the Fifth Circuit has "repeatedly considered the first factor — control over the employee's work — to be the 'central factor' in determining borrowed employee status." *Lomeli*, 363 S.W.3d at 686 (quoting *Brown*, 984 F.2d at 676); *see also Ruiz*, 413 F.2d at 312 (right of control is "perhaps the most universally accepted standard for establishing an employer-employee relationship").  Fredieu argues that the trial record reveals a fact dispute with respect to the control factor.

Fredieu points to his own testimony that he did not need "constant or regular instruction from anybody at W&T Offshore" while working on W&T Offshore's platform.   He highlights his "No" answer in response to a question on direct examination asking:  "Did W&T Offshore have to tell you how to do those things, control the details of your work, as we've heard in this trial?"

Fredieu also highlights an exchange during the cross-examination of Antoine Gautreaux, W&T Offshore's vice president of production:

> Q.     . . . [I]t's clear today in this case that on the day the accident happened, Wes [Fredieu] was over supervising a crew of . . . welders and laborers with nobody from W&T present at all, right?
>
> A.     That's what I understand.
>
> Q.     I mean, you are not telling the jury that they control his work and control the details of his work while he's by himself on another platform with these employees, right?

A.    They trusted his judgment in supervision of those contract laborers.

Q.    That's right.  And because they could trust his judgment, they did not have to control his work, did they?

A.    He was in control.  I'm trying to understand your term "control."

Q.    Well, I agree with you.  I think we can agree on that.  Wes Fredieu was in control of the work, wasn't he?

A.    Yeah.

Q.    True?  I'll repeat the question and you can repeat your answer.  Wesley Fredieu was in control of his work, right?

A.    Yes, sir.

Q.    Okay.  I have that in quotes because that's what you just said, right?  Wes Fredieu was in control of his work, right?

A.    Right.

Q.    Not [W&T Offshore field foreman] Craig Black and not [W&T Offshore lead operator] Jim Mason, true?

A.    True.  The work plan is generally set forth at the morning operations meetings and then each of the various employees will dispatch from the hub platform to the remote platforms and conduct whatever activities are planned for that day.  And the morning meetings are designed to, number one, understand the plan of operations and ensure that the resources are available to do what's necessary.

Fredieu emphasizes that no W&T Offshore supervisor was present on Platform D when Fredieu (1) arrived on the remote platform in the morning to supervise work by contract welders; or (2) discovered a malfunctioning regulator after lunch during his "walk around" and attempted to remove it.

W&T Offshore responds by distinguishing between "routine day-to-day tasks" over which Fredieu had control and the non-routine regulator removal Fredieu was attempting to accomplish when his injury occurred.  W&T Offshore contends it had control over Fredieu and "the details of his work" while he was removing the regulator.  Gautreaux testified that Fredieu's directions for handling the regulator

22

malfunction came from W&T Offshore supervisors, not The Wood Group. W&T Offshore's lead operator, Jim Mason, testified that (1) he was Fredieu's direct supervisor stationed on Platform A; and (2) Fredieu contacted him via radio from Platform D to tell him the regulator had malfunctioned. Mason was asked: "And did you authorize him to proceed to isolate and remove [the regulator] . . . ?" Mason answered: "Yes." W&T Offshore asserts that "Fredieu was receiving instruction directly from Mason over a radio on the precise steps for removing the regulator" and "[t]here is no suggestion in this record that Fredieu exercised any discretion in regard to that task."

Fredieu testified that he radioed Mason "because any time I . . . tampered with their equipment or was going to go into working on it . . . it's theirs, so I have to call and let him know what my findings were and how he wanted to go about fixing it." Fredieu spoke with Mason over the radio after Mason conferred with W&T Offshore's field foreman, Craig Black. Mason told Fredieu the regulator would be removed "because we had discussed removing it and bringing it back to [Platform A] . . . . So we went through a couple steps."

Jack Madeley, a consulting safety engineer, testified that industry standards require a Job Safety Analysis or "JSA" review to be conducted and documented before a worker undertakes a non-routine operation such as removing a regulator "to make sure that all safety aspects of a step-by-step job sequence are taken care of." According to Madeley, "Whoever is going to turn the wrench, whoever is going to service it, whoever is going to direct the action all have to be there involved in performing the JSA on site." Madeley confirmed that Mason did not perform the JSA on Platform D in Fredieu's presence before Fredieu attempted to remove the regulator; instead, it was "done over the radio" because Mason remained on Platform A while Fredieu worked on Platform D.

Fredieu testified as follows with respect to the JSA:

Q. Okay. And while you were talking about step-by-step how you were going to go about removing this regulator, did you recall doing a verbal job safety analysis with Mr. Mason while you were communicating on the radio?

A. Yes, sir. We went over some steps that — you know, to go over removing the regulator.

Q. And once you went over the steps that you need to . . . take with regard to the job safety analysis and the steps that you needed to physically take to actually disconnect and remove the regulator, did you feel comfortable in doing that work?

A. Coming from him, yeah. Yeah. I was just, you know, doing what I was told, so . . .

Q. Doing what you were told by Mr. Mason, correct?

A. Yeah, doing what I was told, to bring the regulator back to [Platform A] . . . .

In conjunction with his radio communications to Fredieu, Mason filled out and signed a JSA form containing the following job description: "Block and bleed the pressure on the Big Joe regulator. Remove, plug lines to bring to SS149 for repair."

The JSA form identifies two steps in a "Sequence of Job Tasks." The first listed task is to "[b]lock valves on each side of the Big Joe Regulator and remove." The second listed task is to "[p]lug line where Big Joe Regulator was removed." The information in the form does not describe how the regulator was to be removed. Madeley answered "No" to a question asking: "It didn't even go through the process of what you are supposed to do in the middle here, did it?" Madeley added: "It left a bunch of steps out." Fredieu did not see or sign the JSA form before beginning work on the regulator on Platform D.

Based on this record, the control evidence goes both ways and created a fact issue for the jury to resolve.

24

Reasonable and fair-minded jurors could resolve this fact issue by crediting testimony from Fredieu and Gautreaux in which they repeatedly affirmed Fredieu's control over his own work tasks. Gautreaux specifically and explicitly disclaimed control by field foreman Black or lead operator Mason over Fredieu's work. Gautreaux drew no distinction regarding Fredieu's level of control over his tasks based on routine versus non-routine operations.

Reasonable and fair-minded jurors also could reject W&T Offshore's contention that Fredieu received detailed instructions from Mason via radio "on the precise steps for removing the regulator" and, therefore, exercised no discretion in performing his work. The jury instead could credit testimony that (1) the mandatory JSA form prepared and signed by Mason in conjunction with his radio communications referenced no details about how Fredieu was supposed to remove the regulator; (2) this form accompanying Mason's radio communications regarding removal of the regulator "didn't . . . go through the process of what you are supposed to do" and "left a bunch of steps out;" and (3) Fredieu never saw or signed the JSA form before he began working on the regulator.

Looking at the evidence in the light most favorable to the verdict and indulging every reasonable inference to support it, we conclude that a fact issue exists on this factor because the control-related evidence falls within the zone of reasonable disagreement. *See Brown*, 984 F.2d at 677 ("At trial, the parties presented conflicting testimony regarding who instructed Brown on how, where, and when to clean the mud. . . . [A] disputed factual issue exists regarding who gave Brown cleaning instructions and who assigned him to the night shift.").

### b. Factor three: agreement, understanding, or meeting of the minds between W&T Offshore and The Wood Group

Paragraph 3 of the Master Service Contract between W&T Offshore and The Wood Group is labeled "Independent Contractor" and states as follows: "It is expressly understood and agreed that Contractor [The Wood Group] is an independent contractor and that neither Contractor nor Contractor's principals, partners, employees, or subcontractors are servants, agents, or employees of W&T." Paragraph 5.3 provides that "an employee shall always be the employee of the entity from which he receives his paycheck." Fredieu received his paycheck from The Wood Group.

W&T Offshore discounts this evidence because, as the First Court of Appeals observed in *Lomeli*, "workplace realities and the parties' actions in carrying out the contract can 'impliedly modify, alter, or waive express contract provisions.'" *Lomeli*, 363 S.W.3d at 689 (quoting *Melancon*, 834 F.2d at 1245); *see also Melancon*, 834 F.2d at 1245 ("[P]arties to a contract cannot automatically prevent a legal status like 'borrowed employee' from arising merely by saying in a provision in their contract that it cannot arise.").

We view the contract in light of the already-discussed fact issue regarding factor one, control over Fredieu's tasks on Platform D. With that backdrop, this record does not conclusively establish that the Master Service Contract's characterization of Fredieu's status was modified or waived by "workplace realities and the parties' actions" so as to negate the statements in paragraphs 3 and 5.3. The contract's characterization of Fredieu's status is not dispositive — but neither is it "no evidence." *See Brown*, 984 F.2d at 677-78.

Reasonable and fair-minded jurors could credit the contract's characterization

26

in assessing Fredieu's status.

        **c.**      **Factor five: termination of relationship with Fredieu's original employer**

As submitted in Question No. 4, this factor asked the jury to consider this question: "Did Wood Group terminate its relationship with Mr. Fredieu before the injury in question?"

This factor focuses on "the lending employer's relationship with the employee while the borrowing occurs." *Brown*, 984 F.2d at 678. "This factor 'does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate'" the borrowed employee doctrine. *Lomeli*, 363 S.W.3d at 691 (quoting *Melancon*, 834 F.2d at 1246).

"We consider whether the original employer exercised control over the employee while he worked for the borrowing employer, whether the original employer placed restrictions on . . . the employee's employment conditions, and whether the original employer could remove the employee from the job . . . if the employee was needed elsewhere." *Id*. (citing *Brown*, 984 F.2d at 679, and *Capps v. N.L. Baroid–NL Indus., Inc.*, 784 F.2d 615, 618 (5th Cir. 1986)).

Fredieu argues that a fact issue exists on this factor. He points to evidence that Patrick Monceaux, his supervisor at The Wood Group, remained in place throughout his employment; determined his platform assignment; and could be called if questions arose while Fredieu was performing work for W&T Offshore. Fredieu and Monceaux testified that The Wood Group could assign Fredieu to work on a platform for any number of its customers, not just W&T Offshore. Fredieu also stresses that he continued to receive training from The Wood Group and was not told that his employment with The Wood Group had terminated.

W&T Offshore asserts that this factor favors borrowed employee status

27

because The Wood Group exercised only "nominal" control, citing Fredieu's testimony that The Wood Group did not give him instructions about the tasks he performed while working on W&T Offshore's platforms.

This conflicting testimony suffices to raise a fact issue regarding factor five. *See Brown*, 984 F.2d at 678 ("Gulf Inland had the right to take Brown off the platform if Gulf Inland needed him elsewhere. Thus, Gulf Inland had not relinquished all control over Brown while he was working on the Union platform.").

### d. Factor six: furnishing place of employment and tools

Fredieu concedes that W&T Offshore provided the place of employment, Platform D, at the time of his injury. The parties disagree regarding the second aspect of this factor, which focuses on provision of tools.

W&T Offshore emphasizes that it provided transportation to the platform along with "radios . . . and all the specialized equipment — tubing, fittings, hammer unions, pipe wrenches, bolts on flanges, hammer wrenches, and others — Fredieu needed to perform the work."

Fredieu asserts that "there is a least a fact issue about who provided the tools" for his work because The Wood Group provided a hard hat, shirt, and jacket, all featuring The Wood Group's logo. It also provided pants, safety glasses, gloves, and steel-toed boots. Fredieu provided his own crescent wrench and channel lock pliers. He testified that he seldom used any tools other than these two items because "[i]f that wouldn't fit it, it was usually a third party" contractor performing the task. Fredieu answered affirmatively to a question that asked if he seldom used other tools "[b]ecause you were always able to get by just using your channel locks and your crescent wrench?"

This testimony raises a fact question and falls within the zone of reasonable

disagreement regarding the provision of tools as an indicator of borrowed employee status. A reasonable and fair-minded jury could credit Fredieu's testimony that W&T Offshore did not provide the primary tools he used in performing his work on the platform.

### e. Factor eight: "right to terminate Fredieu's services on the platform"

The right-to-terminate factor focuses on whether W&T Offshore could discharge Fredieu from its own service — not on whether it could discharge him from his job with The Wood Group. *See Lomeli*, 363 S.W.3d at 692 (citing *Capps*, 784 F.2d at 618); *see also Brown*, 984 F.2d at 679; *Melancon*, 834 F.2d at 1246.[1]

Fredieu points to testimony in which he was asked, "Who had the right to fire you from your job?" He answered, "Wood Group." A follow-up question asked, "Did W&T have the right to end your employment?" Fredieu answered, "No." W&T Offshore points to testimony from Gautreaux and The Wood Group's project manager, Patrick Monceaux; both testified that W&T Offshore could terminate Fredieu's service with W&T Offshore.

This testimony fails to raise a fact issue on factor eight, which weighs in favor of borrowed employee status. *See Lomeli*, 363 S.W.3d at 693 ("Here, it is undisputed that Southwest could not terminate Lomeli's employment relationship with Labor Ready; however, both Wayne Herman and Maria Davila testified that Southwest could end its relationship with Lomeli at any time.").

---

[1] We reject Fredieu's contention in his third issue that the trial court committed charge error by misstating the eighth factor. This factor as submitted in Question No. 4 comports with *Lomeli*, 363 S.W.3d at 692.

### f.    Factor nine:   "obligation to furnish the funds from which Mr. Fredieu was paid"

Question No. 4's formulation of this factor tracks *Lomeli*, 363 S.W.3d at 693. "This factor supports borrowed employee status when the original employer pays the employee 'based on time tickets that had to be verified daily'" by the borrowing employer. *Id*. (quoting *Brown*, 984 F.2d at 679).[2]

Fredieu argues that "[t]here was far more than a scintilla of evidence that W&T did not have the obligation to pay" him because "the evidence is undisputed that Wesley's paychecks came from the Wood Group." He also asserts: "Evidence that W&T was billed for Wesley's services is not equivalent to proof that W&T was obligated to pay Wesley."

W&T Offshore acknowledges that Fredieu's paycheck came from The Wood Group but contends that "the ultimate obligation to pay was owed by W&T, because Wood Group invoiced W&T for the work performed by Fredieu." It points to evidence that W&T Offshore had to approve Fredieu's time cards.

We agree that no fact issue exists as to this factor, which weighs in favor of borrowed employee status. *See Lomeli*, 363 S.W.3d at 693 ("It is undisputed that Labor Ready physically furnished Lomeli each of his paychecks . . . . Lomeli also testified, however, that his superiors at Southwest had to sign the work tickets that he returned to Labor Ready . . . reflect[ing] the number of hours that he worked each day.").

---

[2] Because the trial court's wording of factor nine tracks *Lomeli*, 363 S.W.3d at 693, we reject Fredieu's contention in his third issue that the trial court committed charge error by misstating this factor.

### 3. Assessing the totality of the circumstances based on all *Ruiz* factors

The circumstances balance out as follows based on this record.

Genuine and material fact disputes exist as to three of the nine *Ruiz* factors submitted in Question No. 4. They are factor one, the "central" factor addressing W&T Offshore's control of Fredieu's work; factor five, which focuses on The Wood Group's continuing control while Fredieu performed work for W&T Offshore; and one aspect of factor six, furnishing tools. The jury was entrusted with the resolution of fact issues on these individual factors. Reasonable and fair-minded jurors could (1) determine the fact issues on these factors in Fredieu's favor; and then (2) rely on these factors in determining on balance that W&T Offshore did not satisfy its burden of proof to establish Fredieu's status as W&T Offshore's borrowed employee at the time of his injury.

The third factor weighs against borrowed employee status because the Master Service Contract states that Fredieu (1) is not W&T Offshore's employee; and (2) is the employee of the entity from whom he receives his paycheck. That entity was The Wood Group. Reasonable and fair-minded jurors also could rely on this factor in answering Question No. 4 in Fredieu's favor.

The following *Ruiz* factors weigh in favor of borrowed employee status: factor two (Fredieu was performing W&T Offshore's work); factor four (Fredieu acquiesced); factor seven (length of time); factor eight (W&T Offshore's right to terminate its use of Fredieu's services); and factor nine (obligation to furnish funds used for payment). One aspect of factor six also weighs in favor of borrowed employee status (furnishing place of employment).

We return at this juncture to *Ingram*'s discussion regarding legal sufficiency review of a fact finding based on a multi-factor, totality-of-the-circumstances

31

standard. Unlike *Ingram*, the pertinent factors here are disputed in part and do not all point conclusively in the same direction. *See Ingram*, 288 S.W.3d at 904.

The circumstances here also differ from those in *Lomeli*, in which seven *Ruiz* factors including control pointed conclusively toward borrowed employee status; the seventh factor (length of time) was neutral; and only the third factor (contract characterization) weighed against borrowed employee status. *See Lomeli*, 363 S.W.3d at 694.

In contrast to *Lomeli*, fact issues exist here as to the central "control" factor and two other factors. Viewed in this light, the Master Service Agreement's characterization of Fredieu's status cannot be disregarded as mere boilerplate that was modified or waived by other undisputed circumstances pointing conclusively towards borrowed employee status. Nor can the balance of all *Ruiz* factors — the undisputed ones assessed in combination with disputed factors that the jury reasonably could have decided in Fredieu's favor — be said to point overwhelmingly in a single direction.

Thus, this case falls somewhere in the middle of the "continuum" and "spectrum" described in *Ingram*, 288 S.W.3d at 898, which arises when legal sufficiency review standards are applied to a flexible, multi-factor test. Some of those factors weigh in favor of borrowed employee status on this record, and some do not.

This case's middle location on the spectrum confirms that deciding Fredieu's status was the jury's determination to make based on its assessment of multiple factors in light of the burden of proof borne by W&T Offshore. Deciding Fredieu's status was not a matter-of-law determination to be made by the trial court because certain individual factors are disputed, and because the factors on balance do not "overwhelmingly point to borrowed employee status." *See Brown*, 984 F.2d at 678

n.5.

The jury made its determination by answering "No" in response to Question No. 4. Legally sufficient evidence supports the jury's resolution of disputed individual factors in Fredieu's favor, and the jury's resolution of Question No. 4 in Fredieu's favor based on its consideration of all *Ruiz* factors on balance. Therefore, the jury's "No" answer on borrowed employee status must be upheld.

We sustain Fredieu's first issue. We also sustain Fredieu's second issue in part with respect to the first *Ruiz* factor.

## III. Fredieu's Future Lost Earning Capacity

W&T Offshore raises a cross-point challenging the legal and factual sufficiency of the evidence to support the jury's award for Fredieu's future lost earning capacity. *See* Tex. R. App. P. 25.1. It asks this court to render judgment that Fredieu take nothing on his claim for future loss of earning capacity; alternatively, it asks for a remittitur as to this finding or a remand for a new trial.

W&T Offshore does not challenge the remaining $798,000 awarded by the jury for Fredieu's past and future damages. This unchallenged amount includes $267,000 awarded to Fredieu for future pain, future physical impairment, and future medical expenses.

Question No. 3(h) asked the jury to find the sum of money that would fairly and reasonably compensate for the "[l]oss of earning capacity that, in reasonable probability, Wesley Fredieu will sustain in the future." The jury awarded $950,000 in response to this question.

W&T Offshore contends that this future lost earning capacity award does not withstand appellate scrutiny because

- Fredieu returned to work full time after his arm healed;

33

- his post-injury hourly wage at his new job is higher than his hourly wage at The Wood Group; and

- he receives an additional per diem payment in connection with his new job.

In response, Fredieu contends that the award is supported by testimony from Kenneth McCoin, Ph.D., who testified on Fredieu's behalf as an expert witness on future lost earning capacity. Fredieu stresses that W&T Offshore (1) does not challenge McCoin's qualifications or methodology on appeal; and (2) did not present its own expert at trial to testify on Fredieu's future lost earning capacity.

We assess legal sufficiency under the standard discussed earlier by looking at the evidence in the light most favorable to the verdict and indulging every reasonable inference to support it. *See City of Keller*, 168 S.W.3d at 822. We assess factual sufficiency by considering, weighing, and examining all of the evidence that supports and is contrary to the jury's determination. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). The jury's verdict may be set aside on factual sufficiency grounds "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

"[L]ost earning capacity is an assessment of what the plaintiff's capacity to earn a livelihood actually was and the extent to which that capacity was impaired by the injury." *Scott's Marina at Lake Grapevine Ltd. v. Brown*, 365 S.W.3d 146, 159 (Tex. App.—Amarillo 2012, pet. denied). This concept contemplates a person's "ability and fitness to work in gainful employment for any type of remuneration, including salary, commissions, and other benefits, whether or not the person is actually employed." *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 435 n.2 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Future lost earning capacity is

recoverable as damages in a personal injury case. *Id.* The measure of this type of damages is the plaintiff's diminished earning power or earning capacity in the future directly resulting from the injuries sustained. *Id.*

The Supreme Court of Texas long has recognized the unavoidably imprecise nature of this inquiry. "In a personal injury suit the amount which the plaintiff might have earned in the future is always uncertain, and must be left largely to the sound judgment and discretion of the jury." *McIver v. Gloria*, 169 S.W.2d 710, 712 (Tex. 1943). "However, the verdict must be based on something more than mere conjecture." *Id.* "It must be an intelligent judgment, based upon such facts as are available." *Id.* "No general rule can be laid down, except that each case must be judged upon its peculiar facts, and the damages proved with that degree of certainty of which the case is susceptible." *Id.* The available facts must provide a sufficient basis to enable a fact finder to reasonably measure in monetary terms the claimant's earning capacity before and after the injury. *See King v. Skelly*, 452 S.W.2d 691, 693 (Tex. 1970).

This court too has acknowledged and applied the supreme court's teaching regarding the evidentiary bases for estimates of future lost earning capacity. "Loss of earning capacity that a plaintiff will suffer in the future is always uncertain and is left largely to the jury's sound judgment and discretion." *Tri-State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 492 (Tex. App.—Houston [14th Dist.] 1989, no writ) (citing *McIver*, 169 S.W.2d at 712). "Reduction in actual earnings is the best way to show a reduction in earning capacity . . . but it is not the only way such can be shown." *Springer v. Baggs*, 500 S.W.2d 541, 544 (Tex. Civ. App.—Texarkana 1973, writ ref'd n.r.e.) (citing *McIver*, 169 S.W.2d at 712.) "Reduced earning capacity is not necessarily the same as reduced earnings." *Id.* "One may have a definitely reduced capacity to earn throughout his remaining reasonable life

35

expectancy, and yet still be making as much money a relatively short time after the injury as he was before the injury." *Id.*; *see also Metro. Life Ins. Co. v. Haney*, 987 S.W.2d 236, 245 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("Damages for loss of earning capacity do not have to be based on any specific degree of physical impairment, but can be based on a composite of all of the factors affecting earning capacity.").

This court and others have identified relevant factors informing this determination. "'Factors such as stamina, efficiency, ability to work with pain, and the weakness and degenerative changes which naturally result from an injury and from long suffered pain are legitimate considerations in determining whether or not a person has experienced an impairment in future earning capacity . . . .'" *Tri-State Motor Transit Co.*, 765 S.W.2d at 492 (quoting *Springer*, 500 S.W.2d at 544).

Further, an award can be based on a composite of factors that may affect a person's capacity to earn a living. *E.g., Plainview Motels, Inc. v. Reynolds,* 127 S.W.3d 21, 36 (Tex. App.—Tyler 2003, pet. denied); *Metro. Life Ins. Co.*, 987 S.W.2d at 244. "'Our courts have consistently upheld judgments for reduced earning capacity, even though the plaintiff was making as much or even more money after the injury than before, where it was shown that pain, weakness, diminished functional ability or the like indicated that plaintiff's capacity to get and hold a job, or his capacity for duration, consistency or efficiency of work was impaired.'" *Tri-State Motor Transit Co.*, 765 S.W.2d at 492 (quoting *Springer*, 500 S.W.2d at 544-45); *see also Metro. Life Ins. Co.*, 987 S.W.2d at 244 (same).

We examine the evidence adduced at trial against this legal backdrop.

At the time of his injury in October 2011, Fredieu was 22 years old and a high school graduate. He initially worked as a mechanic after graduating, and then got a job with Nabors Drilling as a roughneck on a land-based drilling rig. He became a

36

roustabout and "C" operator working offshore before joining The Wood Group in 2010 as a "B" operator working offshore. Fredieu earned $16 per hour and an additional 50 percent premium for overtime at The Wood Group. He worked for The Wood Group from 2010 until his injury occurred in October 2011.

Fredieu began working onshore for Berry Brothers General Contractors, Inc., an onshore and offshore construction company, in February 2014 earning $20 per hour; his salary increased to $23 per hour within two months. He earned an additional 50 percent premium for overtime work with Berry Brothers and a $120 per diem payment. Berry Brothers knew Fredieu had been injured and out of work for two years when he was hired in 2014. Fredieu continued to work for Berry Brothers as of the date of trial in August 2015.

Fredieu testified that he lost range of motion in his left arm due to the injury, which continued through the date of trial. Fredieu's treating orthopedic doctor testified that Fredieu always will have limited range of motion and continuing pain from the injury to his left arm; this doctor opined that, to a reasonable degree of medical certainty, the plates and screws used to surgically repair the fractures will remain in Fredieu's arm for the rest of his life. This doctor opined that Fredieu cannot lift more than 35 to 40 pounds with his left arm and should avoid frequent lifting with his injured arm. This doctor further opined that Fredieu should avoid climbing ladders and must guard against blows to the injured arm that could cause the plates to fracture. Based on these circumstances, the doctor testified that Fredieu should avoid jobs involving heavy labor.

W&T Offshore introduced competing expert testimony from an orthopedic surgeon who examined Fredieu's medical records and opined that all arm fractures had healed by March 2012. This doctor stated that he would not have concerns about Fredieu returning to work offshore as an operator on a producing oil and gas

37

platform, or working at a job that required Fredieu to lift 25 pounds or more with his injured left arm. During cross-examination, this doctor testified that he had not examined Fredieu personally; did not know what Fredieu's pain level was as of the time of trial; and did not know what Fredieu's range of motion was as of the time of trial.

Fredieu testified that he obtained his job as a "gang pusher" with Berry Brothers in February 2014 because "I have two cousins that pretty much run the whole show over there. And I got several other family members and friends that work over there . . . ." This job is "mainly just paperwork" rather than a heavy-labor job. Berry Brothers allows Fredieu to perform a "paperwork" job because "they know my injury and they don't force me to do anything and they just let me come over there and work with them."

Fredieu described his working situation as follows:

Q.    Do you know what gang pushers do in the oil and gas business?

A.    Yes.

Q.    You are familiar with what onshore construction companies do in the oil and gas business even from your time working at Nabors back when you first got out of high school?

A.    Yes.

Q.    And is your job at Berry Brothers as a gang pusher, do they make it lighter for you than it is at other companies, for instance, like Nabors?

A.    Oh, yes.

Q.    Do you know of any other gang pusher job or heavy-labor job that you could get in the onshore oil and gas business that would allow you to do it as a light-duty job?

                        *                    *                    *

A.    No, sir.

Q.    If you — how are things going in the oil field with jobs right now?

38

A. Not real good.

Q. Okay.

A. Most of our company is laid off. They are not working anymore, most of them.

Q. If you were to lose your job with Berry Brothers, would you even know where to start looking for a job in the oil field that would accommodate the type of injury you have?

A. No sir, not in the oil field.

W&T Offshore contends that "[t]he proposition that Fredieu might someday lose his job is pure speculation, and is not evidence of a loss of future earning capacity under Texas law." It stresses that "Fredieu is earning *more* after this accident than he was before." It continues as follows: "Make no mistake, this fact is to his credit; but as a result, the evidence is legally and factually insufficient to support his claim to a future loss of earning capacity under Texas law . . . ." The dissent echoes this contention.

W&T Offshore's factual premise — that Fredieu is "earning more" after his injury — is debatable at best. According to the testimony, the hourly wage Fredieu received from Berry Brothers at the time of trial was higher than the pre-injury hourly wage he received from The Wood Group. However, Fredieu was paid for more hours per week while working offshore before his injury; the number of hours for which Berry Brothers paid him per week while working onshore was lower.

Moreover, W&T Offshore and the dissent both rely on an unstated and erroneous legal premise — namely, that the standard governing awards for future lost earning capacity focuses almost exclusively on pre-injury hourly wage versus post-injury hourly wage. They simultaneously discount or disregard other considerations affecting long-term earning prospects over an injured worker's employment lifespan.

39

This legal premise is erroneous because saying that the extent of an injured worker's future lost earning capacity can in some circumstances "best be shown by comparing his actual earnings before and after his injury," *McIver*, 169 S.W.2d at 712, is not equivalent to saying that actual earnings are the exclusive consideration in all cases involving all circumstances. The Supreme Court of Texas long ago rejected the inflexible approach posited by W&T Offshore and the dissent. *See id.* ("No general rule can be laid down, except that each case must be judged upon its peculiar facts, and the damages proved with that degree of certainty of which the case is susceptible."); *see also King*, 452 S.W.2d at 693-94 (sustaining lost earning capacity award when plaintiff presented evidence of value of his work pre-injury, rather than actual earnings).

This court also has eschewed W&T Offshore's and the dissent's rigid approach. *See Tri-State Motor Transit Co.*, 765 S.W.2d at 492 ("'Our courts have consistently upheld judgments for reduced earning capacity, even though the plaintiff was making as much or even more money after the injury than before, where it was shown that pain, weakness, diminished functional ability or the like indicated that plaintiff's capacity to get and hold a job, or his capacity for duration, consistency or efficiency of work was impaired.'") (quoting *Springer*, 500 S.W.2d at 544); *see also Metro. Life Ins. Co.*, 987 S.W.2d at 244 (same).

Applying this precedent, we conclude that legally and factually sufficient evidence supports a determination here that pain, weakness, and diminished functional ability resulting from a serious arm injury impaired Fredieu's capacity to get and keep a job like the one he held at the time of his injury throughout the duration of his working life.

There is no dispute that Fredieu sustained a serious injury. W&T Offshore does not challenge the awards for Fredieu's future medical expenses, future pain,

and future physical impairment; collectively, these awards exceed a quarter of a million dollars. The jury heard competing testimony from medical experts about the continuing medical consequences of Fredieu's injury. His treating orthopedic surgeon opined that Fredieu should avoid heavy labor due to continuing physical consequences accompanying his injury. An orthopedic surgeon presented by W&T Offshore opined that Fredieu could resume the type of vigorous physical work he performed before the injury. The jury was entitled to resolve this fact dispute in Fredieu's favor. The jury also heard testimony regarding the permanency of Fredieu's arm damage; his continuing pain and physical limitations; the unique and hard-to-duplicate circumstances surrounding his post-injury employment with his cousins at Berry Brothers; and the difficult economic environment in the oil field. Based on this record, we reject W&T Offshore's contention that legally and factually insufficient evidence supports the jury's award for future lost earning capacity because Fredieu was earning a higher hourly wage at the time of trial than he earned before he was injured.

The jury also heard economic evidence that enabled a reasonable fact finder to determine the value in monetary terms of Fredieu's future lost earning capacity.

McCoin initially performed an analysis of Fredieu's earnings in 2012, before Fredieu obtained his new job with Berry Brothers in Pecos, Texas. McCoin also performed a second calculation at trial taking into account Fredieu's earnings from his post-injury job with Berry Brothers.

In his 2012 analysis, McCoin estimated that Fredieu had a pre-injury future earning capacity of $1,611,954 based on wages and benefits from The Wood Group totaling $44,268 per year. This evidence provided the jury with a reasonable monetary measure of Fredieu's pre-injury earning capacity. *See King*, 452 S.W.2d at 693; *see also Crown Plumbing, Inc. v. Petrozak*, 751 S.W.2d 936, 938 (Tex.

41

App.—Houston [14th Dist.] 1988, writ denied). McCoin also computed lower post-injury wages and benefits totaling $18,000 per year, and a post-injury future earning capacity of $576,530. The difference between the two future earning capacity figures is $1,035,424.

McCoin described the $18,000 figure as a "starting point" for the jury and "something we can work with to make it conform to what the jury's expectations are of what he can earn post-injury." McCoin testified as follows: "In other words, suppose they thought he could earn 36,000 a year. Well, what would happen? That 576,530 would basically double. You are going from 18 to 36." He continued: "Obviously, the higher his post-injury wage, the less any loss of earning capacity, future earning capacity."

McCoin also performed calculations at trial based on Fredieu's post-injury job and hourly wage with Berry Brothers. He based these calculations on Fredieu's 60-hour work week onshore with Berry Brothers instead of the 84-hour work week Fredieu had before his injury while working offshore with The Wood Group.[3] McCoin took into account additional expenses for Fredieu to travel from his home in Many, Louisiana to Pecos, Texas, where Fredieu lived while working for Berry Brothers. McCoin estimated an "effective wage" of $28,756 per year based on Fredieu's new job with Berry Brothers, compared to a pre-injury "effective wage" of $38,000 based on Fredieu's old job with The Wood Group.

McCoin testified that Fredieu's post-injury future earning capacity based on his post-injury wages and benefits is $946,530. The difference between McCoin's

---

[3] McCoin used a $20 per hour wage for these computations. He testified that using a $23 per hour wage and the same 60-hour work week would increase Fredieu's gross future wages by 1.5 percent unadjusted for taxes. McCoin also testified that Fredieu tallied 44 hours of overtime per week at time-and-a-half while he was working offshore with The Wood Group, compared to 20 hours per week of overtime working onshore with Berry Brothers in Pecos, Texas.

2012 pre-injury future earning capacity figure and the post-injury future earning capacity figure based on Fredieu's post-injury wages and benefits is $665,424. This figure assumes a probability that Fredieu continues to work at a higher hourly wage. McCoin stated: "If he cannot sustain employment, it could go down."

This expert testimony — admitted without objection at trial and unchallenged by W&T Offshore on appeal — established a range for Fredieu's future lost earning capacity between $665,424 on the low side and $1,035,424 on the high side. The low and high figures both take into account estimated future earnings based on continued employment, adjusted for expenses and other factors.[4]

The jury's $950,000 award falls within the range of expert testimony and represents a permissible exercise of the jury's significant discretion based on its assessment of all the evidence. *See Koko Motel, Inc. v. Mayo*, 91 S.W.3d 41, 52 (Tex. App.—Amarillo 2002, pet. denied) (upholding $1.2 million award to concert rigger for impairment to future earning capacity based on foot injury that prevented him from standing for long periods and climbing; award "[did] not exceed the range of loss described by the expert witness"). This evidence includes testimony regarding the permanency of Fredieu's arm damage; his continuing pain and physical limitations; his need to avoid heavy-labor jobs requiring climbing and frequent lifting; economic conditions in the oilfield in 2015; and his employment prospects in light of medical limitations compromising his ability to perform heavy labor.

---

[4] The factors for which McCoin adjusted his computations included "periods when you are between jobs. You get laid . . . off. The oil economy, and we're all familiar with it, how a lot of jobs are at risk right now because of what's happening to oil. They may be unemployed for a while." McCoin further explained that "working is not guaranteed. There is no guarantee of it. You know, you can't say, I'm 20 years old, I'm going to work 40 years. It's not 40 times the annual rate. There is some likelihood that you won't work and you have to address it."

Although W&T Offshore does not mention McCoin's testimony in its brief, the dissent concludes that it is insufficient because McCoin "did not testify that Fredieu suffered lost earning capacity in any amount;" did not testify that Fredieu will earn no more than $8.65 per hour (or any other to-the-penny amount) for the rest of his working life; did not testify that Fredieu will be unable to find another light-duty job like the one with his cousins at Berry Brothers; and "testified that he does not know what Fredieu will earn in the future . . . ."

The dissent's criticisms are misplaced because they (1) demand a level of precision that *McIver*, 169 S.W.2d at 712, and *Tri-State Motor Transit Co.*, 765 S.W.2d at 492, do not; (2) fail to acknowledge that "the amount which the plaintiff might have earned in the future is always uncertain, and must be left largely to the sound judgment and discretion of the jury," *see McIver*, 169 S.W.2d at 712; (3) look at McCoin's testimony in isolation while disregarding or discounting other probative evidence a reasonable fact finder could have credited, including testimony from Fredieu and his treating physician regarding his continuing physical impairment;[5] and (4) erroneously advocate giving conclusive or nearly conclusive weight to "the here and now" when assessing future lost earning capacity — an apparent reference to Fredieu's post-injury hourly wage as of the time of trial. These errors demonstrate that reversal of the jury's award for future lost earning capacity is not warranted based upon this record and the governing legal standards.

The jury was entitled to consider McCoin's testimony regarding a range of scenarios for projected future earnings in light of other evidence — including extensive medical evidence and testimony from Fredieu himself. The jury was

---

[5] *See Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 904 (Tex. App.—Texarkana 2004, pet. denied) (upholding award of future lost earning capacity based on plaintiff's testimony about physical impairment after injury together with other evidence regarding extent of impairment).

entitled to make a future lost earning capacity determination based upon this evidence and reasonable probability that would, in McCoin's words, "conform to what the jury's expectations are of what he can earn post-injury." *See Koko Motel, Inc.* 91 S.W.3d at 52. We conclude that a reasonable and fair-minded jury could award $950,000 in response to Question No. 3(h) on this record; thus, the evidence is legally sufficient to support the award for future lost earning capacity. We further conclude that, based on the evidence as a whole, the jury's answer does not fall outside the range of evidence a reasonable fact finder could accept and is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. We overrule W&T Offshore's cross-point.

The dissent raises an unbriefed challenge to the data and methodology used by Fredieu's expert economist McCoin. This challenge is unbriefed because W&T Offshore did not attack, address, acknowledge, or reference McCoin's testimony on appeal.

The absence of an appellate attack by W&T Offshore on McCoin's testimony is not surprising because W&T Offshore did not object in the trial court to any asserted flaws in his data or methodology. *See, e.g., City of San Antonio v. Pollock,* 284 S.W.3d 809, 816 (Tex. 2009) ("When a scientific opinion is not conclusory but the basis offered for it is unreliable, a party who objects may complain that the evidence is legally insufficient to support the judgment. An objection is required to give the proponent an opportunity to cure any defect thus prevent a trial by ambush."); *see also Towers of Town Lake Condo. Ass'n, Inc. v. Rouhani,* 296 S.W.3d 290, 299 (Tex. App.—Austin 2009, pet. denied) (Litigant who did not object to expert economist's testimony at trial waived for appeal "any complaint regarding the methodology, technique, or foundational data [the expert] . . . used in forming his opinion" that plaintiff sustained $900,000 in loss of future earning capacity as a

45

result of arm fracture.).  McCoin goes unmentioned in the parties' voluminous trial court motions and briefing appearing in the Clerk's Record.  McCoin goes unmentioned in W&T Offshore's appellate briefing.  Only Fredieu references McCoin in his reply brief.

There are gray areas in Texas law concerning the circumstances under which appellate challenges aimed at an expert can be raised on appeal even without a trial court objection because they attack an expert's "conclusory opinions [that] are legally insufficient evidence to support a judgment . . . ."  *See City of San Antonio*, 284 S.W.3d at 816-17.  The distinction between "conclusory" expert opinions and "methodology" flaws is not always 100 percent clear, although the nature of the dissent's complaints here about McCoin's data and methodology in this case fall solidly on the need-an-objection-at-trial side of the line.  *See* Tex. R. App. P. 33.1.

Even assuming for argument's sake that all or part of the expert challenge falls in a gray area, this gray-area challenge still must be briefed before it can be considered on appeal.  Here, it was not.

To be sure, Texas Rule of Appellate Procedure 38.1(f) provides some flex at the joints when it allows that "[t]he statement of an issue or point will be treated as covering every subsidiary question that is fairly included."  But any flex in Rule 38.1(f) cannot bend the advocacy process so far as to authorize resolution of a legal and factual sufficiency challenge based on expert methodology or data complaints that W&T Offshore never asserted.  *See, e.g., Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (per curiam) ("Because Banda did not make this argument in the trial court or in his brief to the court of appeals, the court of appeals could not reverse on this point."); *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 (Tex. 1989) (per curiam) ("None of the arguments were raised by Evans at trial or on appeal, and the court of appeals thus erred in raising these arguments sua sponte and basing its

reversal on these grounds."); *see also Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006) ("Except for fundamental error, appellate courts are not authorized to consider issues not properly raised by the parties.").

## CONCLUSION

We reverse the trial court's judgment and remand for entry of judgment in Fredieu's favor in conformity with this opinion.


/s/    William Boyce
       Justices


Panel consists of Chief Justice Frost and Justices Boyce and Jewell (Frost, C.J., dissent).